## Washington-Greene Legal Aid Society
## Application

*Frank C. Carroll*, for applicant.

SWEET, P. J., February 6, 1968.—This matter comes before the court on the application of the O. E. O. Legal Services for a nonprofit corporation charter. The Washington-Greene Legal Aid Society has asked us, pursuant to the Act of May 5, 1933, P. L. 289, 15 PS §7201 et seq., to grant them powers of a nonprofit corporation " . . . to make available legal aid to all residents in the Counties of Washington and Greene, Commonwealth of Pennsylvania, who, because of their financial inability are unable to procure such legal aid, and to undertake educational programs in which indigent residents may be instructed in and advised of their fundamental private legal rights and obligations, to the end that their performance, motivation and

productivity as citizens may be improved and their respect for the law increased".

Because of the controversial nature of this application, the amount of money involved and the relatively novel nature of the proposal, we ordered a hearing, "as to the necessity, the legality, the propriety and the wisdom of the activities of the proposed corporation".[1]

The Act of 1933, supra, as amended, 15 PS §7207, says, "The court shall consider the application. It may hear evidence, if any there be, on behalf of the applicants and against the application, . . . If the court shall find the articles to be in proper form and within the provisions of this Act, and the purpose or purposes given in the articles to be lawful and not injurious to the community, . . . a charter shall issue". Hence, in compliance with the statutory mandate, we consider if the purposes are lawful and not injurious to the community.

All the learning in this field is new. Judge Raymond Pace Alexander in Community Legal Services, Inc., 43 D. & C. 2d 51 (1967), certiorari refused, has written a 41-page opinion on this subject for Philadelphia C. P. No. 4. He has held "The formation of a nonprofit corporation to provide legal services to persons living in poverty, or low income, does not violate the Act of April 28, 1899, P. L. 117, . . . prohibiting the practice of law by corporations", and that such corporation does not violate Canon XXXV of the A.B.A. Canons of Legal Ethics.

Judge Alexander stated this, "Essentially, in considering the Community Legal Service application four major points require consideration. First, the need for legal services to the poor. Second, whether that need is already being filled. Third, whether it is in the public interest that the need be filled. Finally, we shall discuss the specific objections which have been

[1] See our order of November 30, 1967.

raised to the proposed plan and which in the Court's view are without merit".

It appears that there are already 11[2] of these O.E.O. legal aid societies federally funded in Pennsylvania.

We should make clear at the start that this concerns civil not criminal representation. This is not a public defender—there are no constitutional imperatives via Gideon[3] here.

Applications similar to this came before the Appellate Division in New York State, three being consolidated for a proceeding.[4] The New York courts, speaking through Botein, P. J., said a number of things of interest to us here. For instance, the proposed board of Washington-Greene Legal Aid Society will be 8 members of the bar association, 5 representatives of the poor and 2 appointed by the courts. Botein said corporations licensed to practice law must have directorates of sufficiently small size, palpable groups amenable to discipline and sanction by the court. Directorates of 32 members or more, he says, are too large. Needs for diverse representation and community involvement should be met at a council or other policy group and not in the board of directors or managers of law offices of corporations licensed to practice law, he declared. Although it was based on the New York statute, these cases held that in any legal assistance corporations supported by Federal anti-poverty funds the executive staff, those with responsibility to hire and fire, must

[2] On December 12, 1967, the Bureau of Economic Development, Department of Community Affairs, listed them as follows: Allegheny, Bucks, Dauphin-Cumberland-Perry, Delaware, Erie, Cambria, Lackawanna, Luzerne, Philadelphia, Washington-Greene, and Westmoreland. It should be noted the money is already here in the bank.

[3] Gideon v. Wainwright, 372 U. S. 335 (1963).

[4] Community Action for Legal Services, Inc.; New York Legal Assistance Corporation; Harlem Assertion of Rights, Inc.; consolidated at 274 N.Y.S. 2d 779, 26 A.D. 2d 354 (1966).

be lawyers. The New York court seems to think that it should not be involved through appointment or conferences in management of legal assistance corporations.

This adjudication is not controlling upon us, but it points to a critical problem in the instant case. The poverty program requires that community action programs be ". . . developed, conducted and administered with the maximum feasible participation of residents of the areas and members of the groups served".[5] The poverty area representation on the board will ordinarily be expected to fairly reflect the racial composition and geographic distribution of the poverty population: Guidelines for Legal Services.[6] The program before us, in a sense, stands intellectually on two legs. First, it is a program of the national government. 81 Stat. 698, Public Law 90-222 "legal services" squarely provides for it. Second, the organized bar favors it. The House of Delegates of the American Bar Association on February 8, 1965, fully supported this type of program,[7] but there is an area of conflict

[5] O.E.O. Act, section 202(a) 3.42 U. S. C. §2782.

[6] The Guidelines publication also says, "The representation of the people to be served should be sufficient to assure that the concerns of people in poverty will be articulated and considered. . . ."

[7] FURTHER RESOLVED, that the Association, through its officers and appropriate committees, shall cooperate with the Office of Economic Opportunity and other appropriate groups in the development and implementation of programs for expanding availability of legal services to indigents and persons of low income, such programs to utilize to the maximum extent deemed feasible the experience and facilities of the organized bar, such as legal aid, legal defender, and lawyer referral, and such legal services to be performed by lawyers in accordance with ethical standards of the legal profession; and

FURTHER RESOLVED, that the Association's Committees on Legal Aid and Indigent Defendants and on Lawyer Referral Service shall, in the absence of the creation of a special committee for the purpose have primary responsibility for (I) implementing these resolutions, (II) coordinating with the appropriate Commit-

between the two. The bar association participation is squarely predicated on the proposition of lawyer control of such offices. The text of the act and the N.Y.S. case, supra, both recognize such bar support, but on the other hand, the anti-poverty program, both in its basic law and in its directives, indicates that there must be *maximum feasible participation of the poor.*

The application before us reflects this national dilemma and seeks to reconcile it. It has some nonlawyers representative of the poor in a position of control of policy, but it provides for a director of legal service employees who will exercise executive authority in the office. Probably this is the best compromise that could be planned.

It seems fairly clear that the Canon of Ethics does not prohibit such an organization as this.[8] Canon 35 says that while a lawyer should not be controlled by any corporate lay agency which comes between him and his client that "charitable societies rendering aid to the indigent are not deemed such intermediaries".

Liberals favoring these offices may find some delicious irony in the fact that the American Bar Association once approved a plan by which attorneys associated with the Liberty League publicly advertised free legal services to those challenging the constitutionality of New Deal Legislation. A.B.A. Opinions of the Committee on Professional Ethics and Grievances #148 (1935)[9] said in part the canon ". . . certainly was never aimed at a situation such as this, in which a group of lawyers announced that they are willing to devote some of their time and energy to the *interests of indigent citizens whose constitutional rights are believed to be infringed"* : page 311.

---

tees and Section, and (III) reporting back to this House at the Annual Meeting in August, 1965.

[8] See In re Pinkard, 280 N.Y.S. 2d 959 (1967).

[9] Also reported in Law in Action, September, 1967, footnote 3.

In Gunnels v. Atlanta Bar Association, 191 Ga. 366, 12 S.E. 2d 602 (1940), it seems the Supreme Court of Georgia approved representation by the Atlanta Bar Association, as such, in resisting the overreaching practices of loan sharks in that community and representing poor persons who had fallen into their clutches. A good deal of the steam against group practice of law, qua group practice, has been lost following NAACP v. Button, 371 U.S. 415 (1963), and Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1 (1964). The Button and Brotherhood cases indicate that groups seeking legal services—particularly where constitutional rights or statutory rights are involved —have received from the Supreme Court of the United States constitutional protection against limitations by the bar association. In this connection we might also consider briefly Troutman v. Shriver, 273 F. Supp. 415 (1967), where the United States District Court for the Middle District of Florida dismissed a case against the O.E.O. Legal Services on the ground that the plaintiff had no standing to sue. The basis of the suit was the allegation that O.E.O. Legal Services' programs constituted the unauthorized practice of law. Several Florida county bar associations joined with the plaintiff. This does not solve our problem here, but it shows a hospitable judicial climate toward such an applicant in the United States District Court.

The most ambitious scholarly study of this field which we have been able to find is Neighborhood Law Offices, 80 Harv. L. Rev. 805, February (1967). This characteristically documented article points out the inadequacy of existing charitable legal aid services. It suggests the importance of the neighborhood concept in the furnishing of legal services to the poor and makes a careful distinction between the service function and the nonservice·function of the new legal ser-

vices programs in their component role in the war on poverty. "While the service function—the representation by the neighborhood lawyer of individual clients without regard for broader reform—is the least novel aspect of the New Wave, it is nevertheless crucial to any neighborhood law office program. The service function occupies the great majority of the working hours of most of the lawyers and is the day-to-day means of building the community's trust and confidence in the program, so that the neighborhood concept may become a reality": page 811. A fairly large percentage of the article is devoted to the nonservice functions. These are categorized (A) law reform, (B) community action, and (C) community education. "In order to restore the overall integrity of the adversary system, OEO-funded legal services programs are required to list as one of their goals the reform of substantive law in the interest of the poor": page 813. This is squarely based on the guidelines which say, page 23, "that advocacy of appropriate reforms . . . should be among the services afforded by the program".

Community action seeks to organize "the poor into groups to provide them with a means of achieving power".

". . . the legal services program should also lend its assistance to the more controversial organizations formed by the poor to assert political and economic power . . . in any event, legal assistance to pressure groups is desirable. . . .": page 818. As to Community Education—the Harv. L. Rev. article emphasizes that community education is an essential ingredient of a legal service program. It seems that "The Atlanta Program is planning a system whereby it will be notified of all services of process, so that it can offer its services to the indigent defendant": page 822. We also find in the Harv. L. Rev. article considerable stress

laid on participation of the poor. It is critical of the technique, used by our applicant here, in placing responsibility for the poor on the Board of Trustees. While the N.Y.S. case, supra, was critical of any non-lawyer control over lawyers the Harv. L. Rev. article tends the other way. "But there are disadvantages in giving the poor full control of a legal services program. The attorneys have special responsibilities to their clients, and the poor on the board may not understand the lawyer-client relationship, expecting the attorney to be dedicated to the interest of the poor as a class or even to the more narrow interests of the representatives. Although the attorney should be able to resist pressures to sacrifice his client's interest, it would be preferable not to put him in such a position. *It seems undesirable, however, to attempt to avoid this pressure by giving the organized bar control of the program;* local bar associations tend to be critical of innovation and close to the established interests in society with whom the poor are often in conflict. The adverse effect that control by the organized bar might have on the nonservice functions outweighs the possible advantages of a professionally supervised program": page 830.

We have testimony from Mr. Rapasky, attorney in charge of the program in Allegheny County, and Mr. D. M. Stocks, national deputy director of O.E.O. Legal Services. I think it is a fair summary of their testimony that these witnesses adhere to the philosophy expressed in the Harv. L. Rev. article, supra, although, of course, neither of them specifically adopted any of the language of the article. This is somewhat borne out by the national statistics of the Community Services Program Progress Report for the year July 1, 1966—July 1, 1967. Around the country these offices accepted 290,934 legal problems and rejected 51,640. They took 58,603 into litigation; 40,566 court proceedings; 2,803

administrative proceedings and 608 appeals. Out of 38,603 litigation cases, they claimed to have won 21,122, lost 9,036 and settled 3,429.[10]

The proof of need locally arises most principally from proof of need for such services nationally, and of need for such services in our adjoining county of Allegheny, which interestingly enough, has exactly the same relief load, 4.1 percent, that we do here.[11]

The proponents also presented some testimony as to the number of applicants to our own Washington Bar Association lawyer referral service who are unable to go on with a case for lack of money. The application for the funding of this program contains statistics as to the number of poor persons in Washington and Greene Counties. For instance, it is alleged that in Washington County we have 2,481 families with income of less than $1,000; 3,357 families with income of $1,000 to $2,000; 4,870 families with incomes of $2,000 to $3,000 all in a population of 217,271 people. The statistics of dependency here are depressing. The monthly average number of persons receiving public assistance in Washington County is as follows:[12] In 1966 we had 8,525 persons receiving public assistance; 858 on old age pension; 643 on blind pension; 5,655

---

[10] This suggests that an O.E.O. legal office might contribute significantly to court congestion. We make a good effort here to settle 90 per cent of our personal injury cases, better than 80 per cent of our domestic relations cases and well over half of miscellaneous matters. A law office which settles only between 11 and 12 per cent of its civil cases could pose an almost insuperable obstacle to the elimination of backlog. One wonders why these presumably smaller matters are so intractable to settlement. Are the clients intransigent, cruciferous persons or are the O.E.O. lawyers, nationwide, almost psychopathically pugnacious?

[11] See Social Economic Profile presented by Community Services of Pennsylvania, Table III, extracted from Department of Public Welfare, Office of Planning & Research, Pennsylvania Statistical Abstract (1967).

[12] Ibid.

receiving aid for dependent children; 1,104 getting general assistance; 255 on aid to disabled. Greene County has 2,967 persons receiving public assistance. In Greene County, the figures are even more disturbing: 39,424 people and 837 families have less than $1,000; 1,080 families between $1,000 and $2,000; 1,247 families with less than $3,000. It would seem that at least one-fourth of the people in Greene County are legally indigent.

According to the application, page 6, "In addition to providing the full range of services described in this program, the staff attorney will participate in the educational, training and research programs as they are developed". Two secretaries and three full time nonprofessional aides will be employed.

It seems apparent from a consideration of the application and all the testimony that there is a need for legal service for the indigent in these counties. The applicants intend to carry out an O.E.O. Legal Services Program in accordance with the relevant U.S. statutes and the promulgated guidelines. It is fair to conclude that they intend to conduct both service and nonservice programs, as these were explained hereinabove.

We are urged by many persons of goodwill to adopt this program. Our Congressman, the Hon. Thomas E. Morgan, has written explaining his inability to appear at the hearing: "There is a growing awareness across the country that the poor in fact have been deprived of their rights under the law. To avoid this situation in this area, I hope that you can proceed with the formation of the legal aid that has been so long in process". In a similar letter, Judge John J. McLean, Allegheny Court of Common Pleas, says, "I have had a most favorable experience with the Neighborhood Legal Services' program here in Allegheny County, . . ." Harry M. Cohen, Chairman of the Washington County

Board of Assistance, indicates in his letter the presence of many cases in which the poor need but do not get legal aid. The Hon. Maurice B. Cohill, Jr., Allegheny County Juvenile Court, says that the Neighborhood Legal Service Association over there has been of great value to his court. Richard S. Bachman, Field Service Director of Community Services of Pennsylvania, likewise writing to explain his inability to appear, urges the desirability of the program before us. Our senior senator, Joseph S. Clark, in a speech summarized in Law in Action for November, 1967, said that his committee has made an extensive study of poverty, and in 18 volumes of testimony by ". . . 401 witnesses, not one presented a word of criticism of the Legal Services Program. . . . There was, in short, universal acceptance and approval of the program. . . .": page 3.

From the foregoing we can readily see that there is need for legal services to the poor who abound in Washington and Greene Counties. It is fairly apparent from the documents of record and from the testimony of Mr. McCreight that the need is not concurrently being met. The existence of O.E.O. Legal Services as a matter of national policy, the support of the A.B.A. and the comments set forth immediately hereinabove demonstrate that it is in the public interest that this need be filled. There remain for analysis only the particular objections which we perceive.

It seems to us that we should grant the application. There is little reason to question the legality of the plan nor are we convinced that it will be injurious to the community. At this point, however, a word of caution, precatory perhaps, but none the same strongly felt, seems in order. We are gravely disturbed by the implications of the 'non-service' function referred to indirectly in the application as education, training and research activities. The business of a lawyer en-

gaged by such a nonprofit corporation is to represent indigent persons one by one as they have a need for representation. It is not a class representation of the indigent, as such, nor a collective representation, nor are the poor a single and collective client. To the extent that the Anglo-American legal system still espouses a philosophy of individualism rather than a philosophy of collectivism, rights belong to people. individual people, and not to any great gray mass of "the poor". We do not think that public money should be used to foment rent strikes, promote race riots or encourage civil disobedience.

We believe that this legal aid society should publicize its presence and its availability to furnish legal advice to indigent persons having legal problems. We do not believe that it should seek to create legal problems in order to solve them. We do not desire that there be any incitement of litigation; we are glad to note that the application mentions preventive law.

For such a body or its employes to be engaged in political activities would be unfortunate and indefensible.[13] To this end we direct that the application be amended to state in appropriate language that neither the legal aid society, as such, nor any full time employe thereof be engaged in political activity, as such is defined in the Hatch Act.

We think that it would be inappropriate for us to appoint members of the board of the legal aid society. It may be necessary at some time in the future for us to apply professional discipline should the lawyers or other employes of this society transgress the borders of propriety. Because of the difficulty of drawing a

---

[13] This well may be the necessary implication of 90 per cent Federal funding. See 5 U.S.C.A. 1501, formerly 118 k, et seq. See Palmer v. USCSC, 297 F. 2d 450, cert. denied 369 U. S. 849. Also Engelhardt v. USCSC, 197 F. Supp. 806, aff'd. 304 F. 2d 882 and In Re: Higginbotham, 221 F. Supp. 839, cert. denied, 382 U.S. 853.

line between publicly advising citizens of their legal and constitutional rights, and soliciting legal business or engaging in common barratry, we have some reason to fear that such discipline may become necessary. Because of the foregoing, we direct that the application be amended to provide that the two seats on the board, intended apparently to be public members appointed by us, be filled by the mayors of the two third class cities in the area, viz., Washington and Monongahela.

We take this occasion to remind the public generally that any person aggrieved by the operations of this society has recourse to the courts. It would be invidious indeed were O.E.O. Legal Services organized to prevent injustice to the poor only to become an instrument of malevolence and illegality toward any person, however affluent.

Subject to all that has been said before, we approve the incorporation and, if no objections are taken within seven days of the date hereof and the requisite amendments are filed, a decree in the normal form will issue.