In the Matter of COMMUNITY ACTION FOR LEGAL SERVICES, INC., Petitioner.

In the Matter of NEW YORK LEGAL ASSISTANCE CORPORATION, Petitioner.

In the Matter of HARLEM ASSERTION OF RIGHTS, INC., Petitioner.

First Department, November 15, 1966.

BREITEL, J. Three applications on behalf of proposed corporations wishing to practice law under the provisions of section 280 of the Penal Law are pending before the court. The proposed corporations would be Community Action for Legal Services, Inc., New York Legal Assistance Corporation, and Harlem Assertion of Rights, Inc. The programs they are to implement were conceived, developed, and materially changed, from time to time, over a period of about a year and a half. The instant applications have been presented piecemeal to the court since late August, 1966.[1] The plans are to establish neighborhood law offices and provide representation for disadvantaged members of the community, disadvantaged because of poverty and just as often because of disfavored minority status. The financial support for the programs is expected to come largely, if not exclusively, from Federal funds under the auspices and control of the Federal Office of Economic Opportunity.

Regrettably, the present applications may not be approved by the court. In rejecting them, however, the court invites the resubmission of proposals free from the infirmities in the pres-

1. A fourth application on behalf of another proposed corporation was received on October 10, 1966, and many other similar applications are anticipated.

ent applications, with the suggestion that any new applications be submitted promptly, in final form, and in succinct integrated documents.

In order to assist those who may be interested in preparing new conforming applications it is appropriate to discuss some principles. It is, however, obvious that the discussion cannot possibly be inclusive of all relevant principles or even of all important ones. Too much time and space would be consumed now in such a complete discussion, even if it were possible as an intellectual matter to have one. Moreover, the court can only act on particular submissions before it.

Section 280 of the Penal Law is the governing statute making it a crime for corporations to practice law. It contains, however, an exception for charitable or other corporations which have first obtained approval by the applicable Appellate Division.[2] It is immediately evident that the allowable practice of law by corporations is highly exceptional, permissible only in carefully circumscribed conditions consonant with the policy of limiting the practice of law to licensed professionals. This is a general principle to be observed.

Basic to the principle is that the restriction of legal practice to lawyers and the maintenance of professional standards are for the benefit of the public and not for the economic preservation or professional enhancement of the Bar. The professional standards and Canons of Professional Ethics are justifiable only as protective of the public. Inherent to the legal professional system is the direct and often summary control and discipline of lawyers by the courts (Drinker, Legal Ethics, ch. III). No

---

2. The exception in the statute reads, in pertinent part, as follows: "5. * * * nor shall it apply to organizations organized for benevolent or charitable purposes, or for the purpose of assisting persons without means in the pursuit of any civil remedy, whose existence, organization or incorporation may be approved by the appellate division of the supreme court of the department in which the principal office of such corporation or voluntary association may be located. Nothing herein contained shall be construed to prevent a corporation or association from furnishing to any person, lawfully engaged in the practice of the law, such information or such clerical services in and about his professional work, as, except for the provisions of this section, may be lawful, provided that at all times the lawyer receiving such information or such services shall maintain full professional and direct responsibility to his clients for the information and services so received. But no corporation shall be permitted to render any services which cannot lawfully be rendered by a person not admitted to practice law in this state nor to solicit directly or indirectly professional employment for a lawyer." It is notable that the present applications come to this Appellate Division, although they are city-wide in concern, because the principal offices of the proposed corporations will be located in this Department.

similarly direct, and rarely any summary, control over laymen exists in the courts. The direct and summary control over the members of the profession by any agency, but especially by the courts, is a unique difference distinguishing the legal profession from other professions.

The most embracive of the applications is that on behalf of Community Action for Legal Services, Inc. (CALS). CALS itself would not practice law but it would finance and control subcontractors or delegate agencies which would. Indeed, CALS itself is described as having been delegated its functions and responsibilities by the New York City Council Against Poverty, the community agency for the channeling of Federal antipoverty programs. The moneys would, it is anticipated, be received from Federal antipoverty appropriations. CALS would have a board of directors of 32 members, at least 12 of whom are to be chosen from or recommended by the New York City Council Against Poverty from "nominations made by community committees in designated poverty areas in the City". It might have as many as 35 directors who shall "in the main" be lawyers. It would have power to establish "guidelines" for the operation of legal services programs, that is, neighborhood law offices, and render advice and assistance to delegate agencies. CALS may also conduct audits to insure that there is conformance wtih its guidelines. It would be empowered to "conduct and fund research and informational programs relating to the legal problems of the poor and the amelioration thereof." It would be empowered to establish a "training program" for lawyers and lay personnel of the delegate agency. Under the proposals submitted on its behalf to the Federal Office of Economic Opportunity, the regional unit of that agency would have the oversight of the program as well as the power to audit its finances. CALS would have an advisory committee on legal services with 18 members (only 6 of whom will definitely be lawyers) who would be chosen by law school deans and delegate agencies not represented on the CALS board.

The second application is on behalf of New York Legal Assistance Corporation (NYLAC). This organization is intended to be the principal subcontractor or delegate agency of CALS. It, too, however, in addition to the power to operate its own neighborhood law offices, would be empowered to "contract with other agencies and organizations for the provision of legal services". All of its professional staff would be lawyers. It would be governed by a board of directors of 20 members, 13 of whom must be lawyers. The remaining seven members would

be "representatives of the poor" to be recommended by an "appropriate community agency" from each of the areas where NYLAC would operate a neighborhood law office. Its board of directors could be increased eventually to as many as 35. It would be financed with Federal antipoverty funds "administered" by CALS. It would be empowered to represent groups but "without pursuing non-legal activities". It could use law students under programs approved by the Appellate Division. Initially, NYLAC would establish at least seven neighborhood law offices, and the operation of these offices might either be left to NYLAC itself, another delegate agency, or the existing Legal Aid Society. But the creation of these seven offices would not bar communities from establishing their own offices with CALS or NYLAC assistance and funds.

The third application is on behalf of Harlem Assertion of Rights, Inc. (HAR). This proposed corporation is sponsored by Haryou-Act, Inc. The papers submitted on its behalf are the least succinct and the most dependent upon cross-incorporations by reference or necessary effect. As a consequence, this application is the most difficult of the three to summarize with any assurance of accuracy or with confidence that the proposal is being fairly described. The plan is to establish five neighborhood law offices in what is designated as Central Harlem under delegation from CALS through NYLAC. The services to be provided are to be wide-ranging, covering not only legal advocacy but "community education, and research so that the poor will have equality before the bar of justice and mutual respect will be created between law enforcement officials and the Central Harlem community". HAR would have three separate training programs to educate the lawyers, "the professionals", and "the consumers of injustice". The "professionals" are defined as personnel of Haryou-Act, Inc. HAR would educate the "consumers of injustice" in "consumer education" as well as "the rights of the arrested". It would send lawyers to community group meetings and would disseminate written or printed material. Lawyers would be urged to acquaint themselves with the social services available to their clients. It would start with limited indigency standards but these would be open-ended for the future. It would also utilize a lawyer referral system and the Harlem lawyers would have a "first right of refusal". Its board of directors would be limited to 15, of which 5 would be poor persons in the neighborhood, 6 lawyers, 2 representatives of Haryou-Act, Inc., and the executive director of Harlem Neighborhood Legal Assistance Project

(HNLAP).³ The executive directors of Haryou-Act, Inc. and HAR would be ex officio members. Eleven of the members would have alternates who would be entitled to attend all meetings of the board but to vote only in the absence of their principals. Most important, the executive director for HAR would be designated by Haryou-Act, Inc., not by HAR's own board of directors.

The three applications have only been very sketchily described and primarily to demonstrate the complex interrelationship and the great potential for coexistence in the same areas of differently sponsored antipoverty neighborhood law offices. With only partial separation of fiscal controls from professional supervision there is at the top the Federal Office of Economic Opportunity, functioning through its regional office. The local community office, the New York City Council Against Poverty is also involved. Then at the professional top but not completely professionalized is CALS. It would be created, it is said, in order to provide an independent, and presumably insulating, entity. Under CALS is NYLAC operating its own offices but also being the channel for all others who will act as delegate agencies. In the case of HAR, it not only functions as a delegate agency of CALS and NYLAC but has the potential for still a further level of delegation as in the instance of HNLAP. And the end of proliferation and ramification for the future is never in sight.

There can be no effective professional or disciplinary supervision by the court or the agencies interposed over such a multitude of licensed corporations operating competitively in the same area. Again, the court is not judicially concerned with the obvious waste in such duplication and, perhaps unseemly, competition. Rather, its official concern is with the feasibility of maintaining minimal standards. The interposition of supervising licensed corporations and the unlimited power of contracting out of legal services to delegate, subdelegate, and sub-subdelegate agencies is a thicket through which none could penetrate, even if the nonlawyer controls were eliminated. Hence, recognizing the novelty and difficulty of the programs contemplated and the anticipated use of laymen by the lawyers

---

3. Another existing and therefore sixth neighborhood law office (see footnote following) with which it is proposed to make a new contract for additional delegated legal services programs. The HAR proposal contains detailed provisions for the reorganization of the internal structure and program of this project. The details are even more complicated than those described above for HAR itself.

to a degree never before countenanced in the profession, the court should not license more than one legal assistance corporation, using Federal economic antipoverty funds, in any one area, as large as a county or at least half a county. One set of neighborhood law offices operated by one entity in such an area is both enough and all that could be responsibly supervised by any one directorate and by this court insofar as gross breaches of ethics may ever become involved.[4] The present proposals are just unworkable because of the clumsy overlapping, excessive layers of organizations, and the built-in incentives to competitive antipoverty law offices operating in the same area.

On the basis of these remarks, the pending applications are deficient. No matter how many interpositions of corporations and boards are provided, with respect to each proposed corporation the lawyer operations would be subject ultimately to lay control. This is not permissible if the public is to be protected from abuses and if this court is to carry out its responsibility to enforce minimum standards on those over whom it has direct control.[5] Nor does the statute permit it.

In this connection the court would have no concern, as it could not, with any council or advisory group, consisting exclusively or largely of laymen, in any legal assistance corporation, reviewing and addressing itself to broad questions of policy. But the court is concerned that such a corporation be directly controlled and supervised by lawyers summarily responsible to the court for the maintenance of professional standards (Judiciary Law, § 90, [subd. 2]). Additionally, in any legal assistance corporation, supported by Federal antipoverty funds, the executive staff, and those with the responsibility to hire and discharge staff from the very top to the lowest lay echelon must be lawyers.

---

4. Illustrative of the overorganization and complexity of the proposed projects is the fourth and separate application of Harlem Neighborhood Legal Assistance Project, Inc. (HNLAP) received on October 10, 1966. This project, mentioned earlier, is proposed to be an agency of Harlem Assertion of Rights, Inc., which is an offshoot of Haryou-Act, Inc. Harlem Assertion of Rights, Inc., is also proposed to be a delegate of New York Legal Assistance Corp. which in turn is a delegate or agency of Community Action for Legal Services, Inc. Federal funds would be channeled through the last corporation. The program also calls for New York Legal Assistance Corp. to " coordinate " the work of this new corporation with that of bar associations and The Legal Aid Society. To accomplish some of this " coordination " it is planned to have some interlocking directors among some of these organizations. It would take more than a battery of lawyers to work one's way through this convoluted arrangement, let alone exercise responsible professional supervision.

5. *Matter of Gandhi Soc. for Human Rights* (17 A D 2d 622); Canons of Professional Ethics, canon 35.

Because the court must be able to supervise those licensed by it, it must insist upon directorates of sufficiently small size, palpable groups amenable to its discipline and sanction in the event there is complaint that professional standards have been violated. Directorates of the size of 32 members or more mean, of necessity, a diffusion of managerial responsibility or delegation to others. Recognizing the need for diverse representation and the requirements of the Federal agency for community involvement, it is suggested that those needs be met in a council or other policy group as mentioned above and not in the board of directors or managers of law offices. This should involve no serious difficulty. The management of law offices is not something in which even involved members of the community may be deemed to be competent. No one would assume that patients are competent to tell physicians how to practice their profession. On the other hand, the competence of lay members of the community to speak for themselves on broad questions of policy affecting the community cannot be gainsaid.

At this point, it may be helpful to note that those who sponsor a legal assistance corporation need not be lawyers. But once a licensed corporation is created, it could and should be cut loose from the sponsors, if they are not lawyers or cannot meet the standards required for operation of a legal assistance corporation. This separation should apply to hiring and fiscal functions, for the power to hire and that of the purse are overwhelming. As for fiscal audit controls that is another matter which should be left for direct handling between the Federal disbursing agency and the licensed corporation with provision that such audit shall not involve control, even indirectly, over the practice of law by lawyers and their responsibilities. In making these comments the court is not officially concerned with the efficiency, economy, or esthetics of any planned program, none of which is its proper concern. Rather it is concerned with insuring that the public will receive the best available legal services in the same way as those who retain their own private lawyers, with effective recourse to the court for gross professional failure.

Moreover, if the difficulties discussed are eliminated the serious concern felt by this court and expressed by the bar generally about protection of the confidentiality between lawyer and client would largely disappear. It would still be necessary, however, to state and define both the independence and the inviolability of the lawyer-client relation in neighborhood law offices. Notably, the statute is explicit in providing that the lawyer must "maintain full professional and direct responsibility to his

clients for the information and services so received '' (Penal Law, § 280, subd. 5, quoted *supra*).

Apart from these major matters deriving from the basic applicable principles there are other issues raised by the pending applications. Some are discussed below, but once again, it is not possible to consider every possible objection at this time without in effect rewriting the applications for the proposers which is neither the proper function nor burden of the court.

In each of the pending applications there is provision for the parent corporation to lay down undefined '' guidelines '' for the operation of the neighborhood law offices. The court may not thus delegate its responsibility over professional standards, if that is what is intended. Applications and proposed orders should present the standards or '' guidelines '' in mind so that this court's approval of the application will define powers and embrace the approval of all professional standards. Moreover, all the proposals are deficient, albeit in each case in varying degrees, in not prohibiting entirely and without evasive qualification political, lobbying, and propagandistic activity. At least one of the applications is deficient in not setting forth precisely the standards of eligibility for prospective clients. The others have standards of eligibility included in long historical-analytical descriptions of the programs submitted with the applications. The proposals for referral of ineligible clients to lawyers are deficient in being subject to easy abuse, discrimination among available lawyers, and even corruption, especially when considered in conjunction with the relatively unrestricted use of laymen as '' investigators '' for the neighborhood law offices. The applications are gravely deficient in not setting up standards and controls over laymen to be employed outside the law offices. The obvious dangers to the public in the utilization of such persons without adequate controls is evident (see Canons of Professional Ethics, canons 27, 28 and 37). The proposals ignore all that has been learned over the years in the regulation and prohibitions governing investigators, solicitors of legal business, fee-sharing, and the like (Drinker, *op. cit.*, pp. 63–68).

Each of the pending applications in setting forth purposes is unsatisfactory in the indiscriminate mingling of social goals and legitimate legal practice. Recognizing that the law may be a constructive progressive force in the development of a community, and particularly that social goals involve significant lay leadership and lay individual engagement, the interrelation of social goals with the practice of law still must be better and even precisely defined, or if not definable, separated. In this

connection the vaguely suggested subprograms for education, alerting the communities to the opportunities for the assertion of legal rights, and the use of the law and its institutions in achieving social and economic (as distinguished from legal) justice are especially illustrative of indiscriminate mingling of goals which require either definition or separation.

The proposed corporations are projected to allow them to represent groups as distinguished from individuals. Again, the lack of definition and standards for eligibility is woeful. It would be one thing to allow neighborhood law offices to handle poor men's credit unions. It would be quite another thing to have them handle, advise, and represent political factions or organizations of social and economic protest, however worthy.

Each of the applications proposes the use of law students in the practice of the law, but no standards or controls are provided. The new statutes never contemplated that the Appellate Divisions would approve such blanket authority for corporate agencies practicing law, and indeed proscribe such grant of authority (Penal Law, §§ 270 and 271, as last amd. by L. 1965, ch. 877).[6]

Lastly, the court does not favor its involvement, directly or indirectly, including through any of its constituent or associated committees or conferences, in the actual direction or management of legal assistance corporations or in the selection of those who will have the responsibilities of management and control. The role of the court must be preserved in all eventualities to consider and pass independently upon the conduct of the licensed corporations in the event of violations of standards imposed or other professional misconduct.

In view of the novelty of the programs, the obvious dangers of mistakes and abuse, and the possibility of fluctuating Federal policies and financial support in this area, it would seem desirable that any authority granted by this court to practice law under section 280 should be limited in time. This was done by the Appellate Division of the Second Department in approving the application of the Nassau County Legal Services Committee,

---

6. The pertinent part of section 270 reads as follows: " * * * or (2) to law students in their senior or final year of law school acting under the supervision of a legal aid organization whose existence, organization or incorporation is approved by the appellate division of the supreme court of the department in which the principal office of such organization is located, when such students are acting under a program approved by that appellate division and specifying the extent to which the students may engage in activities otherwise prohibited by this statute." Section 271 contains a similar provision.

Inc. in June, 1966 and by this court in approving the application of Mobilization for Youth, Inc. on December 31, 1963.

The court, in conclusion, affirms its recognition of the importance of the programs involved. It accepts, indeed is hospitable to the view, that new institutions must be fashioned to function alongside traditional legal aid societies. It believes that such a development will involve change and enlargement in traditional concepts of professional standards, ethics, and office organization. Nevertheless, it still must require that protection of the public be the paramount and final determinant of the form and content of any institutional development of these new programs over which it has responsibilities. Certainly, factional, political, and narrow group or professional interests must be either subordinated or ignored entirely in the fashioning of these new institutions, if the service of such interests would impede the protection of the public.

Accordingly, the applications are denied without prejudice to the prompt submission in proper final form of new limited applications in conformance with the principles suggested. Any new submission should consist of the proposed certificate of incorporation and an application with proposed order attached, each self-contained and complete, setting forth in the order the powers, standards, and limitations required. The operative papers should not incorporate by reference budgets, prospectuses, historical monographs, or the like, although such papers may be properly submitted in support of the application at the same time.

After the submission of new papers, proper in form, a petitioner, if it be so advised, may apply for a hearing before the court. In such event the application should be in writing and should list succinctly the issues upon which the petitioner requests to be heard.

BOTEIN, P. J., RABIN, McNALLY and STEVENS, JJ., concur.

Applications unanimously denied without prejudice to the prompt submission in proper final form of new limited applications in conformance with the principles suggested. Any new submission should consist of the proposed certificate of incorporation and an application withp roposed order attached, each self-contained and complete, setting forth in the order the powers, standards and limitations required. The operative papers should not incorporate by reference budgets, prosepectuses, historical monographs, or the like, although such papers may be properly submitted in support of the application at the same time. After the submission of new papers, proper in form,

a petitioner, if it be so advised, may apply for a hearing before the court. In such event the application should be in writing and should list succinctly the issues upon which the petitioner requests to be heard.

