IN THE MATTER OF EDUCATION LAW CENTER, INC., APPELLANT.

Argued February 24, 1981—Decided May 20, 1981.

*Jeffrey W. Lorell* argued the cause for appellant (*Clapp & Eisenberg*, attorneys).

*C. Michael Bryce*, Assistant Deputy Public Advocate, argued the cause for *amicus curiae* New Jersey Department of the Public Advocate (*Stanley C. Van Ness*, Public Advocate, attorney; *Arthur Penn*, Assistant Commissioner, and *C. Michael Bryce*, on the brief).

*Erminie L. Conley*, Assistant Attorney General, argued the cause for *amicus curiae* Attorney General (*Judith A. Yaskin*, Acting Attorney General of New Jersey, attorney).

*Gilbert S. Leeds* argued the cause for respondent Committee on the Unauthorized Practice of Law (*Richard J. Engelhardt*, Secretary).

*Frank Askin* submitted a brief on behalf of *amici curiae* American Civil Liberties Union, American Civil Liberties Union of New Jersey, and Center for Constitutional Rights (*Frank Askin*, attorney; *Elizabeth M. Schneider, Charles Sims, Bruce J. Ennis*, members of the New York bar, and *Morton Stavis*, of counsel).

*Waldron Kraemer* submitted a brief on behalf of *amici curiae* Council for Public Interest Law, Center for Law and Social Policy, Center for Public Representation, Inc., Children's De-

fense Fund, Equal Rights Advocates, Inc., Institute for Public Representation, Mental Health Law Project, National Health Law Program, National Housing Law Project, National Veterans Law Center, NOW Legal Defense and Education Fund, Puerto Rican Legal Defense and Education Fund, Inc., Women's Law Project, and Women's Legal Defense Fund (*Kasen & Kraemer*, attorneys; *David B. Isbell, Fred D. Hutchison* and *William M. Paul*, members of the District of Columbia bar, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

*R.* 1:21–1(c) generally prohibits corporations from practicing law in this State.[1] In this case we must decide whether this rule applies to a non-profit corporation operating for charitable and benevolent purposes which, as part of its activities, maintains a staff of full-time attorneys to represent private parties without charge in litigation affecting the public interest.

Applying the literal language of *R.* 1:21–1(c), the Committee on the Unauthorized Practice of Law held that petitioner, Education Law Center, Inc., is engaged in the unauthorized practice of law. For the reasons and subject to the limitations set forth below, we believe the rule should be modified. Further, we call upon the Civil Practice Committee to revise *R.* 1:21–1(c) to permit the practice of law by non-profit corporations operating

---

[1] *R.* 1:21 pertains to the practice of law. Section 1(c) of the Rule provides:
 Prohibition on Corporation. Except as otherwise provided by *R.* 1:21–1A (professional corporations), *R.* 6:11 (appearances in small claims division), *R.* 7:4–2(b) (pleas in municipal court), *R.* 7:4–4(a) (presence of defendant in municipal court) and by *R.* 7:7–4 (municipal court violations bureau), a corporation shall not practice law in this State, nor shall it appear nor file any paper in any action in any court of this State except through an attorney authorized to practice in this State. The fact that an officer, trustee, director, agent or employee of a corporation shall be an attorney authorized to practice in this State shall not be held to entitle such individual or corporation to do any act prohibited by these rules.

for charitable and benevolent purposes in accordance with the guidelines in this opinion.

I

Petitioner, Education Law Center, Inc., (ELC) is organized as a charitable corporation under the laws of this State and is recognized as tax exempt under federal tax laws. ELC was founded in 1973 with a grant from the Ford Foundation and has since continued to receive considerable funding from that source, as well as from several other charitable organizations, government agencies and for-profit corporations.

ELC's area of concern is public elementary and secondary education in New Jersey and Pennsylvania. According to its annual report, it seeks by various means "to insure that all children receive an equal educational opportunity, that no child is denied the benefits of a 'thorough and efficient system of free public schools,' and that educational decision-making is open and responsive to the interests of public education consumers."

Overall responsibility for ELC rests with its Board of Directors, comprised of 25 members, of whom roughly half are lawyers at present, the remainder being educators and others active in community affairs. ELC's paid staff includes an executive director, six lawyers, two paralegals and administrative and support personnel.

ELC's activities include both non-legal and legal work, but the latter predominates.[2] ELC's legal services, all of which are provided without charge, are of three types: (1) provision of advice and information to members of the public concerning legal aspects of education issues; (2) intervention on behalf of individuals and organizations in ongoing litigation raising education issues; and (3) representation of members of the public in

---

[2]In its 1979 annual report, ELC describes itself as "a public interest law firm." The "summary of accomplishments" in the same document cites mainly litigation and other legal activities.

private litigation or administrative proceedings involving education issues.

ELC's Board of Trustees, while setting overall program priorities for the organization, does not make decisions about individual cases. These decisions are made by the Litigation Review Committee, comprised of six attorney members of the Board of Trustees chosen annually by the Chairman of the Board to oversee legal-policy decision-making for ELC. This committee selects cases based on general, non-confidential information provided by ELC staff. Although ELC does not charge clients for its services, the financial status of the client is not a factor in the selection of cases. Rather, a case will be taken solely on the basis of whether it raises important education issues.

According to the affidavit of ELC's executive director, once a case has been accepted and an ELC staff lawyer begins to work on it, the Litigation Review Committee has no further involvement in the matter. Instead, according to this affidavit,

> The traditional attorney-client relationship exists between the lawyer and the particular client, and the lawyer recognizes an absolute duty of loyalty to the client. Once a lawyer is retained by a client, the client's particular interests guide *all* decisions made by the lawyer.... [T]he actual conduct of the litigation is under the *complete and exclusive control* of the lawyer retained by the client. [emphasis in original]

These general observations are followed in the affidavit by examples intended to illustrate that once an ELC lawyer commences work on a case, that lawyer will "unhesitatingly act in the best interests" of the client, all cases being "aggressively prosecuted long after law reform issues have evaporated."[3]

---

[3]Once ELC has accepted the case and an ELC attorney has assumed responsibility for it, both the client and the attorney sign a printed retainer agreement which provides, among other things, that "[i]t is understood that the Education Law Center does not practice law and does not represent clients, but that the client will be represented by the attorney or attorneys assigned to the case." The agreement further specifies that "[n]either attorney nor client will compromise or settle any related claim or action without the consent of the other or enter into discussion or negotiations with a third party without prior consultation."

In 1979, ELC's activities were brought to the attention of this Court's Committee on the Unauthorized Practice of Law in a complaint filed with the Committee, *R.* 1:22–5. ELC submitted two memoranda to the Committee in which it argued strenuously that ELC lawyers maintain full and unfettered attorney-client relationships with persons they represent, and that such relationships are in no way compromised or interfered with by any other ELC personnel or board members. Nonetheless, the Committee found, as expressed in its brief opinion, that "the attorneys employed by E.L.C. are agents of the corporation whose prime consideration may be their employer's interests rather than the interest of the client." Consequently, the Committee held that ELC "is engaged in the unauthorized practice of law by acting contrary to the provisions of Rule 1:21–1(c)," which prohibits the practice of law by corporations. We granted ELC's petition for review of the Committee's decision, *R.* 1:19–8, and stayed that decision pending our review.

We share the Committee's concern that the provision of legal representation by staff attorneys of a corporation creates the danger that those attorneys may be subject to pressures from the corporation and that the attorney-client relationship may be interfered with. However, we are satisfied that because of the scrupulous care taken by ELC to avoid these dangers, they are not present in this case. Furthermore, we recognize the important role which charitable and benevolent organizations such as ELC play in pursuing legal questions of public importance, thereby benefiting groups or individuals who might otherwise go unrepresented.

Consequently, we hold that ELC is engaged in the practice of law but that such practice is not unauthorized under our Rules.

## II

Our principal concern in this case derives from our responsibility to insure that the highest standards of integrity and professional responsibility are maintained in the relations between

attorneys and their clients. We have recently endorsed the following views on this subject:

> There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably or faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it. [*In re Loring*, 73 *N.J.* 282, 289–90 (1977), quoting *Stockton v. Ford*, 52 *U.S.* (11 *How.*) 232, 247, 13 *L.Ed.* 676, 682–83 (1850)]

*See also In re LiVolsi*, 85 *N.J.* 576 (1981).

■ The attorney-client relationship must rest upon the principle that "an attorney owes complete and undivided loyalty to the client who has retained him. The attorney should be able to advise the client in such a way as to protect the client's interests, utilizing his professional training, ability and judgment to the utmost." *In re Dolan*, 76 *N.J.* 1, 9 (1978). *Cf.* DR 5–105 (lawyers must avoid conflicts of interest in representation); DR 5–107 (lawyers must avoid being influenced by others than their clients).

■ It is our constitutional duty to regulate "the admission to the practice of law and the discipline of persons admitted," *N.J.Const.* (1947), Art. 6, § 2, par. 3. In our exercise of this duty we are guided not by any desire to confer upon lawyers "a professional monopoly, but rather to serve the public right to protection against unlearned and unskilled advice in matters relating to the science of the law," *Auerbacher v. Wood*, 142 *N.J.Eq.* 484, 486 (E & A 1948), and to ensure, insofar as possible, that the highest standards of loyalty and integrity will be maintained by all lawyers in this State. *See New Jersey State Bar Ass'n v. Northern New Jersey Mortgage Associates*, 32 *N.J.* 430, 436 (1960).

■ The fact that legal services may be provided without charge to the client by a lawyer employed by a public interest law firm or a legal services office is, of course, irrelevant to the applicability of the principles stated above. All lawyers admit-

ted to practice undertake a "dual trust": a duty to this Court to observe all appropriate standards of professional conduct and responsibility, and an obligation to their client to advance the client's cause to the best of their ability without allowing any conflicting loyalty or obligation to interfere. *See In re Opinion of the Justices*, 289 *Mass.* 607, 613, 194 *N.E.* 313, 317 (1935).

█ These concerns are the basis for the general prohibition of the practice of law by corporations. *R.* 1:21–1(c). *See generally Unger v. Landlords' Management Corporation*, 114 *N.J.Eq.* 68, 72–73 (Ch.1933); *In re Co-operative Law Co.*, 198 *N.Y.* 479, 92 *N.E.* 15 (1910); *People v. Merchants' Protective Corporation*, 189 *Cal.* 531, 209 *P.* 363 (1922); *Opinion of the Justices, supra*; 7 *Am.Jur.2d, Attorneys at Law* §§ 109–12 (1980). First, the relationship of confidentiality, trust and undivided loyalty which must exist between a lawyer and his client could be impaired if the lawyer is employed by a corporation.[4] The dilemma which may arise has been aptly described as follows:

Economic, political, or social pressures by third persons are less likely to impinge upon the independent judgment of a lawyer in a matter in which he is compensated directly by his client and his professional work is exclusively with his client. On the other hand, if a lawyer is compensated from a source other than his client, he may feel a sense of responsibility to someone other than his client. [American Bar Association, *Code of Professional Responsibility*, EC 5–22 (1980)]

In recognition of this problem, DR 5–107(B) provides that

A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

---

[4]The same objection arguably could be raised when a lawyer is employed by, rather than a member of, or a shareholder in, a law partnership or a professional corporation. However, we consider a dispositive difference to be the fact that the members of a law partnership or shareholders of a professional corporation are all lawyers, unlike other corporations some or all of whose directors or trustees may be non-lawyers. Thus, lawyers employed by partnerships or professional corporations work for lawyers fully aware of pertinent standards of ethics and professional responsibility and subject to the discipline of this Court.

*Cf. In re Dolan, supra,* 76 *N.J.* at 14 (Pashman, J., concurring and dissenting) ("Dual representation" by same lawyer of "primary client" and "derivative client" may create an intolerable degree of divided allegiance.).

■ Allowing the practice of law in corporate form other than under the professional corporations exception of *R.* 1:21–1A could enable entities to practice law which are partly or wholly directed by non-lawyers.[5] *Unger v. Landlords' Management Corp., supra,* 114 *N.J.Eq.* at 73; *Application of Community Action for Legal Services, Inc.,* 26 *A.D.*2d 354, 360, 274 *N.Y.S.*2d 779, 787 (1966). An overriding fear in this regard is that the corporation may place its own interests, whether political goals or profits, ahead of the interests of its clients, a situation which can give rise to a variety of evils.

A person or organization that pays or furnishes lawyers to represent others possesses a potential power to exert strong presures against the independent judgment of those lawyers. Some employers may be interested in furthering their own economic, political, or social goals without regard to the professional responsibility of the lawyer to his individual client. Others may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client. On some occasions, decisions on priority of work may be made by the employer rather than the lawyer with the result that prosecution of work already undertaken for clients is postponed to their detriment. Similarly, an employer may seek, consciously or unconsciously, to further its own economic interests through the action of the lawyers employed by it. [*Code of Professional Responsibility, supra,* EC 5–23]

Not only might the corporation thereby subvert the responsibility of the lawyer to his client, *cf.* DR 7–101 (obligation of lawyer

---

[5]In this regard we note and reject the argument of *amici* Council for Public Interest Law, *et al.,* that ELC does not practice law. In its 1979 annual report, ELC described itself as "a public interest law firm that provides free legal representation to children, parents and community groups in matters involving public elementary and secondary education. Through a program of law reform litigation, advocacy, and negotiation it seeks to insure that all children receive an equal educational opportunity." The individual responsibility of ELC staff attorneys for the cases which they are assigned and their primary obligation to their clients is no different from that of lawyers in law partnerships or professional corporations, organizations which obviously practice law.

zealously to represent his client), the corporation might lack sensitivity to the needs of our system of justice and commitment to its fair and efficient operation. These problems are all compounded by the fact that corporations, unlike licensed attorneys, are not subject to "direct and often summary control and discipline . . . by the courts" which is "[i]nherent to the legal professional system." *Community Action for Legal Services, supra,* 26 *A.D.*2d at 356, 274 *N.Y.S.*2d at 784.

 Each of these principles supporting the general prohibition of the practice of law by corporations is as applicable to non-profit public interest law firms as it is to for-profit corporations.[6] A confidential relationship between attorney and client must be preserved inviolate whether or nor the client pays for the legal services rendered. The client's interests must guide the lawyer's actions. The lawyer must always remain fully accountable to the client for services rendered and subject to the discipline of this Court and the strictures of the Disciplinary Rules. Corporations, operating in the public interest or otherwise, may not engage in "the indiscriminate mingling of social goals and legitimate legal practice," *Application of Community Action for Legal Services, supra,* 26 *A.D.*2d at 362, 274 *N.Y.S.*2d at 789, or in any way influence an attorney in their employ in the handling of a case. Thus, we are not prepared simply to exempt from the prohibition of *R.* 1:21–1(c) corporations like ELC that wish to practice law, albeit without charge to clients and in the public interest.

---

[6]The practice of law for profit by specially denominated "professional corporations" has, of course, been permitted in this State since 1969. However, the governing rules and statutes, *R.* 1:21–1A; *N.J.S.A.* 14A:17–1 *et seq.,* make it clear that a professional corporation is not as much a corporation practicing law as a lawyer or law firm permitted to assume corporate status for tax purposes. Most important, a professional corporation "shall comply with and be subject to all rules governing the practice of law by attorneys and it shall do nothing which, if done by an individual attorney would violate the standards of professional conduct applicable to attorneys licensed to practice law in this State." *R.* 1:21–1A(2).

■ At the same time, we are conscious of the important contribution that public interest law firms such as ELC have made and will, we hope, continue to make to the welfare and well-being of the citizens of this State. Justice Clifford, writing for a unanimous Court, only recently said,

> The practice of public interest law is a much needed catalyst in our legal system. It helps to create a balance of economic and social interests and to assure that all interests have a fair chance to be heard with the help of an attorney.
>
> Public interest lawyers today provide representation to a broad range of relatively powerless minorities—for example, the mentally ill, children, and the poor of all races. They also represent neglected but widely diffuse interests that most of us share as consumers and as individuals in need of privacy and a healthy environment. [Marshall, "Financing Public Interest Law Practice: The Role of the Organized Bar," 61 *A.B.A.J.* 1487 (1975).]
>
> The vital need to hold the government accountable to those it serves and the need to provide legal voices for those muted by poverty and political impotence cannot be overemphasized. [*Tp. of Mt. Laurel v. Public Advocate*, 83 *N.J.* 522, 535–36 (1980)]

Furthermore, we recognize that the special needs and commitments of such community-oriented organizations may require that they include non-lawyers among their directors and overall policy-makers. Considerations of public policy thus lead us to conclude that if other considerations impel such entities to organize as non-profit corporations, it may be possible for such corporations to practice law, provided certain rigorous standards are met, notwithstanding the general prohibition of *R.* 1:21–1(c).

### III

We believe that a satisfactory balance between the prevention of abuses at which *R.* 1:21–1(c) was directed and the advancement of the public good which is the *raison d'être* of public interest law firms can be attained, and such organizations can be permitted to assume the corporate form, if the following standards are met.

■ First, the role of the public interest law firm as regards the relationship between individual staff attorneys and clients must be limited to that of "a conduit or intermediary to bring the attorney and client together" which "does not purport

to control or exploit the manner in which the attorney represents his . . . client." *Touchy v. Houston Legal Foundation,* 432 *S.W.*2d 690, 695 (Tex.1968); *Azzarello v. Legal Aid Society of Cleveland,* 117 *Ohio App.* 471, 185 *N.E.*2d 566, 570 (1962). Once a staff attorney is retained by a client, there can be no interference in the attorney-client relationship by the organization. Staff attorneys must remain fully responsible to the client and the corporation must be liable for any damages arising from the attorney's malpractice. *Cf. R.* 1:21–1A(a)(3) (requiring professional corporations to maintain malpractice insurance coverage for their attorneys). In the course of this representation, lawyers are, of course, subject to all Disciplinary Rules and to the discipline of this Court. The responsibility of the lawyer to the client naturally includes the pursuit of the client's best interests in all legal matters. *Cf.* DR 7–101 (a lawyer shall represent his or her client zealously).

We recognize, as noted above, the importance to the vitality and effectiveness of public interest law firms of involvement by non-lawyers, who represent community viewpoints and provide expertise in non-legal matters. As far as legal matters are concerned, however, the participation of such non-lawyers must be limited to the formulation of broad policies, *Application of Community Action for Legal Services, supra,* 26 *A.D.*2d at 360, 274 *N.Y.S.*2d at 787; *Code of Professional Responsibility, supra,* EC 5–24, and the use of "reasonable procedures to review periodically the actions of [the organization's] personnel to determine whether the board's policy directives have been adhered to," A.B.A. Committee on Ethics and Professional Responsibility, *Formal Opinion 324,* 56 *A.B.A.J.* 1168, 1170 (1970). Determinations of which cases to accept and all decisions concerning how such cases are to be handled must be made by lawyers, either employed by the organization or members of its board, who are fully cognizant of governing professional standards and who are responsible to this Court for maintenance of those standards. *See* A.B.A. Committee on Professional Ethics, *Formal Opinion 303* (1961) at 664. Once a staff attorney has begun representa-

tion of a client in a case, it would be prudent for the board to "take special precautions not to interfere with its attorney's independent professional judgment in the handling of the matter." *Formal Opinion 324, supra,* 56 *A.B.A.J.* at 1170.

Having delineated the relevant standards, we call upon the Civil Practice Committee to revise *R.* 1:21–1(c) to permit the practice of law by private non-profit public interest law groups in accordance with those standards. An important part of the Committee's task will be to devise criteria for identifying such organizations.

## IV

Turning to the present case, we are satisfied, based on careful scrutiny of the record, that ELC is a public interest law firm organized as a non-profit corporation that operates in accordance with the standards set out above and is consequently not engaged in the unauthorized practice of law. As noted above, *supra* at 130–131, although ELC has a board of directors that includes non-lawyers as well as lawyers, that board is responsible only for policy-making. Decisions as to which cases to accept are made by a subcommittee of the board comprised solely of lawyers. Clients of ELC attorneys are informed via a printed retainer agreement that representation is being provided by the staff attorney, not ELC. ELC's executive director made it clear in her affidavit that once representation of a client by an ELC lawyer is commenced, all decisions concerning the matter are dictated by the client's best interests, not ELC's policy goals, and that there is no interference by the ELC board in the individual lawyer's prosecution of the case. We further note that ELC provides extensive malpractice insurance coverage for its staff attorneys. Finally, all of ELC's staff attorneys working in New Jersey are admitted to the bar of this State, and are consequently subject to all of the Disciplinary Rules and to the discipline of this Court.

## V

In sum, we reaffirm the policies on which the general prohibition of the practice of law by corporations is based. However, we believe that competing policy considerations call for an exemption of non-profit corporations operating for charitable and benevolent purposes, provided such organizations respond to the concerns which are the source of the prohibition. Because the record in this case establishes that ELC does so, we reverse the decision of the Committee below which held that ELC is engaged in the unauthorized practice of law.[7] Further, we call upon the Civil Practice Committee to amend R. 1:21–1(c) in accordance with this opinion.

*For reversal*—Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance*—None.

---

[7]As a consequence of this decision, we find it unnecessary to reach the constitutional issues raised by ELC and *amici curiae.*