IN RE WEISS, HEALEY & REA AND INDIVIDUALLY, JOSEPH C. WEISS, JAMES F. HEALEY AND THOMAS REA.

Argued September 29, 1987—Decided February 4, 1988.

*William T. Cahill, Jr.*, argued the cause for appellants, Weiss, Healey & Rea, etc., et al. (*Cahill, Wilinski & Cahill*, attorneys; *Daniel M. Baker*, on the brief).

*Michael R. Clancy*, Deputy Attorney General, argued the cause, for respondent, Advisory Committee on Professional Ethics (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

*Elmer M. Matthews* argued the cause, for amicus curiae American Insurance Association.

*Jan M. Schlesinger* argued the cause, for amicus curiae New Jersey State Bar Association.

The opinion of the Court was delivered by

O'HERN, J.

Lawyers and judges often ask, as did the playwright, "What's in a name?" *Scholastic Sys., Inc. v. LeLoup,* 307 *So.*2d 166, 171 (Fla.1974); *Brazeal v. Redburn,* 638 *S.W.*2d 771, 772 (Mo.App.1982); *Farmers Ins. Co. v. State Farm Mut. Auto Ins. Co.,* 613 *S.W.*2d 158, 161 (Mo.App.1981). Apparently a lot. At least, a lot of people think so. In this case, three attorneys seek to use their individual names to designate their professional association.

"Weiss, Healey & Rea" is the name under which an association of eight attorneys, all of whom are full-time employees of an insurance company, conducts business in Mount Holly, New Jersey. The record does not disclose whether their office is in the same building as the insurance company's. Joseph Weiss, characterized by petitioners as the "senior partner" of the group, is the insurance company's Regional Manager for Legal Services in New Jersey. In this capacity, he establishes office management policies and procedures, performs personnel planning and budgetary functions for the office, and handles some trial work. James Healey is the insurance company's senior trial attorney and heads a litigation team that handles the trial work in the southern portion of New Jersey. The third attorney, Thomas Rea, is the supervisor of a litigation team that handles all of the insurance company's trial work in the central part of the State. He also engages in the daily management of the office in the absence of Mr. Weiss.

The attorneys devote their time exclusively to the defense of the insurance company's insureds. Within the association, they cover for each other at pretrial and trial stages. They also share in strategy decisions. However, as full-time employees of the insurance company, the attorneys are not permitted to

represent members of the general public other than their own close relatives.

Petitioners share no profits or losses from their insurance-related activities. There is no written agreement among the eight attorneys, and all expenses incurred from the representation of the insureds are paid by the insurance company.

Petitioners requested an opinion from the Advisory Committee on Professional Ethics (ACPE) concerning the propriety of their use of the name, "Weiss, Healey & Rea." The ACPE held that the use of this name is proscribed by Rule of Professional Conduct (RPC) 7.5(d). *Opinion* 593, 118 *N.J.L.J.* 580 (1986).[1] The Committee stated that "attorneys who are not partners may not combine their names for an office designation that implies a partnership practice." *Id.* at 592. In their view, an invitation to partnership, as the most "appropriate means of recognizing achievements of professional staff," implies the respect of existing partners for an associate's skills, "sense of responsibility[,] and commitment to the practice of law." *Id.* Thus, *Opinion* 593 rejects as impractical, misleading, and inappropriate any attempt "to rebut the inference of partnership" by adding, at the end of the series of names that designates the firm, such disclaimers as "an association of attorneys"; "an association of attorneys, not a partnership"; "in house counsel for A.B. Corp."; and "litigation attorneys for policyholders of A.B. Corp." *Id.*

We granted the attorneys' petition for review of the ACPE's opinion. 107 *N.J.* 166 (1987). The New Jersey State Bar Association submitted an *amicus* brief supporting the ACPE. The American Insurance Association, whose membership consists of over 172 insurance companies, most of whom are

---

[1] The Committee's opinion embraced two other inquiries that we do not address here. Our disposition of this matter may prompt the Committee's further consideration of those questions.

licensed to do business in New Jersey, filed an *amicus* brief arguing for reversal of ACPE *Opinion* 593. Because the problem posed extends beyond the eight attorneys in petitioners' group, we shall use the letters "A, B & C" as a generic shorthand for similar designations.

Preliminarily, we note that the question before us is not whether an insurer may provide in-house counsel for its insured. *See Use of House Counsel by Insurance Companies to Defend Insureds,* Opinion No. 23 of the Committee on the Unauthorized Practice of Law, 114 *N.J.L.J.* 421 (1984). Nor is the question whether the traditional form of partnership practice is the only manner in which legal services may be rendered. *See In re Education Law Center, Inc.,* 86 *N.J.* 124 (1981) (public interest law firm organized as a corporation is not engaged in unauthorized practice of law); and Rule 1:21–1A (attorneys may form professional corporations to engage in the practice of law). Rather, the question is how the form of association involved here may be designated.

In recent examinations of proposed firm names, we have attempted to clarify the relationships between the private and public interests involved. Firm names, like trade names, are forms of commercial speech. *Opinion* 475, 89 *N.J.* 74, 82–83 n. 2 (1982).[2] As such, their use enjoys constitutional protection "only to the extent that it conveys facts which facilitate honest commercial transactions." *Id.* at 83. In *Opinion* 475, *supra,* 89 *N.J.* at 82, we found that because Leonard Jacoby and Stephen Meyers had never been licensed to practice in New Jersey, the name "Jacoby & Meyers" constituted a deceptive trade name when used in connection with legal services offered

---

[2]We use the abbreviated citation to refer to our affirmance of *Opinion* 475 of the Advisory Committee on Professional Ethics. Its full citation is *In re Professional Ethics Advisory Committee Opinion 475,* 89 *N.J.* 74, *appeal dismissed,* 459 *U.S.* 962, 74 *L.Ed.*2d 272 (1982).

by New Jersey attorneys.[3]

"Under our rules, law firm names are 'official' designations, and therefore are regulated more carefully than [the commercial speech in] ordinary advertising." *Opinion* 475, *supra*, 89 *N.J.* at 87. When we seek "simply to ensure that the official status of an attorney as one licensed to practice in New Jersey is conveyed with accuracy and clarity, there can be no doubt about the validity of a rule proscribing deceptive law firm names." *Id.* at 87–88.

Of course, the issue here is not status to practice but rather status under which to practice. The function that a firm name has in conveying status of association to practice is akin to the secondary meaning of a trade name described in the Minority Report of the Committee on Attorney Advertising:

> The minority believes that the public puts little stock today in the name of a law firm except insofar as that name is a symbol of the *kind and caliber of legal services rendered.* [emphasis added] It is this secondary meaning that is paramount. Thus, it is the *advertising* which creates this secondary meaning

---

[3]Disciplinary Rule (DR) 2-105 was amended on January 16, 1984, and renumbered as RPC 7.5(b) when the Court adopted the Rules of Professional Conduct, effective September 10, 1984. *See* Rule 1:14. The new rule permits interstate law firms such as Jacoby & Meyers to use the same name in New Jersey as in other jurisdictions, provided that where all lawyers of the firm are identified, the jurisdictional limitations of those not licensed to practice in New Jersey are specified. In addition, "[w]here the name of an attorney not licensed to practice in this State is used in a firm name, any advertisement, letterhead or other communication containing the firm name must include the name of at least one licensed New Jersey attorney who is responsible for the firm's New Jersey practice or the local office thereof." RPC 7.5(b); *see* ACPE *Opinion* 550, 115 *N.J.L.J.* 77 (1985) (clarifying requirements of RPC 7.5(b) and RPC 7.5(c)); *see also Opinion* 543, 114 *N.J.L.J.* 387 (1984), and *Opinion* 533, 114 *N.J.L.J.* 1 (1984) (New Jersey attorney employment with out-of-state firm permissible, where bona fide full-time employment relationship and bona fide in-State law office exist and where status of partners and associates made clear on letterhead and other listings).

In 1986, we created the Committee on Attorney Advertising, whose duty in part would be "to determine compliance of particular [attorney advertisements] with * * * [RPC] 7.5." *Petition of Felmeister & Isaacs,* 104 *N.J.* 515, 549 (1986). That Committee recently submitted its first Annual Report, which will be published shortly.

that must be regulated and scrutinized to assure that the public is not misled or deceived about the prices and quality of legal services. [Supplement to *N.J. L.J.*, May 5, 1983, at 14.]

The question here is whether there is anything deceptive about the use of a name like "A, B & C" to describe the association of attorney employees of an insurance company. We believe that it is evident that the mere use of the name "A, B & C" does not convey "with accuracy and clarity" the complex set of relationships that distinguish an association of attorneys representing a single insurer and its policy-holders from an association of attorneys affiliated for the general practice of law. Yet, what secondary meaning *does* this form of firm name convey to the public? What does it tell us about the "kind and caliber" of legal services rendered by such an association?

We believe that the message conveyed by the firm name "A, B & C" is that the three persons designated are engaged in the general practice of law in New Jersey as partners. Such partnership implies the full financial and professional responsibility of a law firm that has pooled its resources of intellect and capital to serve a general clientele. The partnership arrangement implies much more than office space shared by representatives of a single insurer. Put differently, the designation "A, B & C" does not imply that the associated attorneys are in fact employees, with whatever inferences a client might draw about their ultimate interest and advice. The public, we believe, infers that the collective professional, ethical, and financial responsibility of a partnership-in-fact bespeaks the "kind and caliber of legal services rendered." [4]

As noted, however, the members of petitioners' group are in fact paid by one insurer to provide legal services only to it and

---

[4] We realize that the problem regarding assurance of collective responsibility could be resolved by requirements that attorneys practicing in such an association be collectively responsible to the clients, and that the employer indemnify for any losses.

its policy-holders. We realize that in this limited context, they will not ordinarily encounter problems of conflict of interest; in almost all cases, the interests of both the insurer and the policy-holder will coincide.[5]

But lawyers in general practice, except when they have limited their practices, would provide a broader approach to a client's problems. They would not limit their concern to the insurance aspects of the litigation. This record does not establish how attorneys acting as house counsel would approach a multifaceted situation, nor does it establish whether they would be permitted to advise policy-holders with respect to various affiliated matters arising out of the policy-holders' transactions with the carrier. These may be concerns more fanciful than real: we suspect that in the vast majority of cases the attorneys will be able to decide clearly whether the carrier's interests may diverge from the clients'. *See, e.g.,* ACPE *Opinion* 527, 113 *N.J.L.J.* 384 (1984) (firm retained by insurance company represented both defendant physician and defendant hospital in medical malpractice action); *Opinion* 405, 102 *N.J.L.J.* 297 (1978) (labor organization attorney representing individual members); *Opinion* 362, 100 *N.J.L.J.* 1 (1977) (representing both labor union and individual member).

We recognize that these problems are intrinsic to the house-counsel form of practice, whether that practice is denominated by the name of an individual lead counsel or by the names of co-counsel. Such problems frequently arise when outside counsel represent almost exclusively a single insurer. However, we believe that the clients of in-house counsel should have a full

---

[5]Instances in which the interests of the parties might not coincide have been addressed by ACPE *Opinion* 502, 110 *N.J.L.J.* 349 (1982), *Opinion* 407, 102 *N.J.L.J.* 363 (1978), and *Opinion* 165, 92 *N.J.L.J.* 831 (1969) (disputed facts re coverage). *See also Opinion* 357, 99 *N.J.L.J.* 1074 (1976) (representing both plaintiff and insurer); *Opinion* 333, 99 *N.J.L.J.* 496 (1976) (insurance company's counsel representing both insured original defendant and insured third-party defendant); *Opinion* 166, 92 *N.J.L.J.* 843 (1969) (use at trial of statements given by policyholder to insurance companies).

understanding of the kind and caliber of legal services that they are receiving.

Thus, we are not satisfied on this record that there is sufficient reason to depart from RPC 7.5(d). Accordingly, we affirm the ACPE's ruling that the choice of name violates the rule as it now stands. Nonetheless, we recognize the genuine interest of the petitioners in being permitted to practice under a name that they believe reflects the nature of their association. By expressing their association in terms more akin to those of attorneys in other firms designated as partnerships, petitioners would gain the obvious benefits not only of public esteem but also of self-esteem. These are not second-class lawyers; these are first-class lawyers who are delivering legal services in an evolving format.[6] If this form of practice results in lower legal costs, the public has an interest in seeing that able attorneys continue to be attracted to it.

▉ The State Bar Association has suggested a disclaimer to petitioners' firm name to state that petitioners are employed by the insurer. While, as noted above, *Opinion* 593, *supra,* 118 *N.J.L.J.* 580, generally rejects disclaimers of partnership, it may well be that a less burdensome statement would adequately convey "with accuracy and clarity" the nature, the quality, and the caliber of petitioners' practice. The difficulty in fashioning an appropriate disclaimer is that the more accurately it conveys the relationship of the associates to the insurer, the less valu-

---

[6]This area is still in flux: the recently-announced *Opinion* 2 of the Committee on Attorney Advertising "interprets RPC 7.5(a) as requiring absolute uniformity in the format of firm names. * * * On its face, this rule prohibits a firm name from containing any word or phrase other than proper names." 120 *N.J.L.J.* 789 (1987). *Opinion* 2 prevents a law firm from taking a name such as "B and Associates" (overruling ACPE *Opinion* 224, 94 *N.J.L.J.* 1206 (1971), and *Opinion* 479, 107 *N.J.L.J.* 329 (1981)).

This Court recently granted a petition to review the permissibility of another law organization's name. *In re 1115 Legal Service Care,* 108 *N.J.* 668 (1987) (use of union employer's name to designate entity delivering legal services to union members).

able it may become to them. Still, we believe that nothing but benefit can be obtained by remitting to a special Supreme Court committee the question of whether we can accommodate the admitted interests of the petitioners by allowing them to communicate the genuineness of their association, while at the same time signifying, without deprecation, the true relationship that they have with their employer. We have used the format of committee study to accommodate the Jacoby & Meyers issues, *see Opinion 475, supra,* 89 *N.J.* 74, 79 (remand to special Supreme Court Committee), and other problems of practice, *see, e.g., IMO ACPE Opinion #545,* 102 *N.J.* 339 (1985) (remand to ACPE to develop better record on conflict between local board and regional board).

The record developed with the pooled experience and wisdom of such a committee will help us to evaluate the fine-tuning of the RPC that might allow appropriate designations of such associations. Some of the questions that may be more fully developed in such a setting would include:

1. The extent to which such names lead to misunderstanding, misrepresentation, and deception vis-a-vis the assureds and other counsel, and other harmful effects, if any. For example, how would assureds evaluate advice that private counsel might be needed in particular contexts?

2. What are the benefits, public or private, that will accrue from the approval of alternate designations? In this context, what is the history of the use of such designations in New Jersey and elsewhere?

3. What alternatives may be suggested to accomodate the public's interest in being free of the risk of deception in receiving legal services, and the attorneys' private interest in being free to designate their affiliation by the name they choose?

4. What collateral consequences will flow from such changes? Will approval of the designation "A, B & C" or alternatives dilute public perceptions of the established usage

of such names? Will these changes be applicable to other in-house counsel situations, such as those of major business entities?

ACPE *Opinion* 593 is affirmed. We will remand the issue of appropriate alternative designations, if any, to a special Supreme Court committee for its report and recommendations. We shall not require that the petitioners cease to use the name during the period of our further review, provided that adequate disclosure is made to clients, court, and counsel.

*For affirmance and remandment—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.*

*Dissenting*—Justice CLIFFORD—1.

CLIFFORD, J., dissenting.

The Court's decision reminds one of a familiar German expression: "die pferde hinder den wagen spannen"—to put the cart before the horse. The majority has decided that the matter before us requires further review, and that a special committee should assist us in determining such questions as whether "approval of the designation 'A, B & C' [Weiss, Healey & Rea] * * * [will] dilute public perceptions of the established usage of such names." *Ante* at 255–56. It seems to me that if the answer to that question and other suggested inquiries establish that no one has been or will be damaged, confused, misled, or in any wise adversely affected by petitioners' use of the name under which they have been practicing, then there is no good reason for the rule that underlies the challenged opinion of the Advisory Committee on Professional Ethics. In that case we should not affirm Opinion 593, and we should scrap so much of the rule as would undo an arrangement under which this firm has operated, and, significantly, under which dozens (if not scores) of other firms have similarly operated for

years, even decades, during which time I recall not one word of complaint.

As *amicus,* American Insurance Association, reminds us:

There is a real world out there; a world this Court recognizes and every day continues to face. It is a world burgeoning with newly admitted lawyers of every age and of every experience. They face problems of increasing legal complexity and increasing ethical magnitude. They all do not, because they unfortunately cannot, aspire to that glamorous state of achievement of receiving the "invitation to partnership." *Amicus* Association recalls those days with fondness as well, when tort law was uncomplicated and the populace less litigious. But those times have changed and the practice of law is adapting itself to the various demands that are being made on it as a profession. One of those demands has been met by the use of house counsel by insurance carriers to defend law suits against its assureds ancillary to its use of retained counsel. Legally and ethically, this has been approved in all jurisdictions where it has been questioned* * *.

The ethics question posed in the opinion at issue involves simply the designation used by those staff attorneys as they act in concert. None of the briefs filed herein raises even a breath of suspicion of unethical conduct or practice involving the current manner of designation that has been in use in this jurisdiction since the memory of man runneth not.

For the moment I would hold on to the cart and put the horse ahead. Wherefore I dissent.