NEW JERSEY STATE BAR ASSOCIATION, A CORPORATION
OF THE STATE OF NEW JERSEY, PLAINTIFF-APPEL-
LANT AND CROSS-RESPONDENT, v. NORTHERN NEW
JERSEY MORTGAGE ASSOCIATES, A NEW JERSEY
CORPORATION, *ET AL.*, DEFENDANTS-RESPONDENTS
AND CROSS-APPELLANTS, AND LAWYERS MORTGAGE
AND TITLE COMPANY, A NEW YORK CORPORATION,
ETC., DEFENDANT-RESPONDENT.

Argued March 8, 1960—Decided May 23, 1960.

*Mr. Milton T. Lasher* argued the cause for the plaintiff-appellant and cross-respondent New Jersey State Bar Association.

*Mr. John J. Monigan, Jr.,* argued the cause for the defendant-respondent Lawyers Mortgage and Title Company (*Messrs. Stryker, Tams & Horner,* attorneys; *Mr. Howard G. Wachenfeld,* on the brief).

*Mr. Milton M. Unger* argued the cause for the defendants-respondents and cross-appellants Northern New Jersey Mortgage Associates, *et al.* (*Messrs. Milton M. and Adrian M. Unger,* attorneys; *Mr. Sam Denstman,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The plaintiff New Jersey State Bar Association and the defendants Northern New Jersey Mortgage Associates and Northern New Jersey Abstract Company appealed to the Appellate Division from portions of the judgment entered in the Chancery Division pursuant to Judge Scherer's opinion, reported at 55 *N. J. Super.* 230. We certified their appeals on our own motion while they were pending in the Appellate Division.

In 1955 the State Bar Association (and five individual plaintiffs) sought to enjoin the Mortgage Associates and the Abstract Company from engaging in conduct which allegedly constituted the unauthorized practice of the law. The Chancery Division entered summary judgment in favor of the Mortgage Associates and the Abstract Company but, on appeal, this court directed that there be a plenary hearing in the Chancery Division as to the State Bar Association's complaint. See 22 *N. J.* 184 (1956). Thereafter additional testimony was taken and disclosed that on November 1, 1956, the assets of the Mortgage Associates and the Abstract Company were sold to the Lawyers Mortgage and Title Company, a New York corporation which continued operations at the same premises (133 Cedar Lane, Teaneck) with substantially the same personnel. The Abstract Company was dissolved as of December 24, 1956, and the Mortgage Associates was dissolved as of November 3, 1957. The State Bar Association was granted leave, on March 5, 1957, to join the Title Company as a party defendant and in due course it filed an amended or supplemental complaint seeking injunctive relief and alleging that, since its purchase of the assets of the Mortgage Associates and the Abstract Company, the Title Company had engaged in conduct which

constituted the unauthorized practice of the law. In its answer the Title Company asserted that it had purchased the physical assets of the Mortgage Associates and the Abstract Company and was engaged in the business of "searching, insuring titles, loaning money on mortgages and in performing legitimate services in connection therewith" but it denied that it engaged in any conduct which constituted the unauthorized practice of the law.

In a pretrial order dated January 30, 1958 the Title Company set forth that its activities fell into three general classifications, namely, (1) the making of mortgage loans directly by the Title Company as mortgagee, (2) the placing of mortgages for other institutions such as banks and organizations which loan money on mortgages and the insuring of title in connection with such loans and (3) the insuring of lands of corporations and individuals, the causing of searches to be made and the servicing of the mortgages. Under the first classification the Title Company stated that it "customarily draws the bond and mortgage necessary for the purpose of making the loan"; it denied that it draws "deeds, affidavits of title by the seller or resolutions." Under the second classification the Title Company stated that it places mortgages and insures titles incident thereto and "at the request of the mortgagee draws the title instruments except such as at times are prepared by the mortgagee or its attorneys." Under the third classification the Title Company stated that it "causes searches to be made and makes abstracts and services mortgages and insures titles and makes a commensurate charge therefor." In his opinion in the Chancery Division, Judge Scherer noted that the Title Company employs attorneys on a salary basis to "read titles, examine abstracts submitted by others, prepare closing papers and close titles"; he noted that it also employed a non-lawyer who "closed construction mortgage payments involving tract construction, but did not close the permanent mortgage loans to individual home buyers." See 55 *N. J. Super.*, at *page* 239.

The Title Company acknowledged that, in addition to forms of bonds and mortgages, it maintained at its offices, supplies of forms of other instruments including deeds, corporate resolutions, satisfactions and releases of mortgages, estoppel certificates and affidavits; it stated that these forms were kept merely for the convenience of the bar generally, but there was testimony indicating that it prepared affidavits of title and other instruments such as satisfactions and releases of mortgages, in addition to bonds and mortgages; it denied that it prepared deeds but there was testimony indicating that occasionally deeds had been prepared by its employees as a matter of courtesy; it denied that it undertook to resolve any title problems although there was testimony indicating that where there were objections to title it would attempt "to clear them"—one of its employees testified that "if it is a minor objection that can be cleared up by a telephone call or a letter, otherwise we sent a report of the title to the broker or the person representing the seller and secure whatever proof necessary to clear it"; and it denied that it made any charges for services in connection with its preparation of the bonds and mortgages and other instruments but there was testimony indicating that in addition to separate charges for the "mortgage title policy" and specific items such as surveys and recording fees, the buyers paid fees for "search and title abstracting"—these fees for "search and title abstracting" were generally in a fixed sum of $200 or $225 and exceeded by far the cost to the Title Company of the search and abstract. Passing mention may be made of the fact that the Title Company oftentimes received an additional "1% flat fee" which imposed on the buyer a substantial charge above the principal of his mortgage and the stated interest thereon. See *Transcripts of Hearings before the New Jersey Legislature's Joint Commission to Study and Investigate Certain Allegedly Unfair Practices in Connection with the Making of Loans Secured by Mortgages on Residential Prop-*

*erties—created by Assembly Concurrent Resolution No.* 30 (1957) *and reconstituted under ACR* 1 (1958).

Judge Scherer concluded that the proof did "not preponderate" in favor of the plaintiff's contention that the Title Company was practicing law. He declined to grant injunctive relief and dismissed the plaintiff's amended or supplemental complaint against the Title Company with the proviso that the Title Company "shall no longer employ a non-lawyer to handle the tract construction loan payments." See 55 *N. J. Super.,* at *page* 248. He also dismissed the complaint against the Mortgage Associates and the Abstract Company but directed that costs be taxed against them. The plaintiff's appeal is from the dismissal of the amended or supplemental complaint against the Title Company and the appeal of the Mortgage Associates and the Abstract Company is from the taxation of costs against them. The plaintiff did not appeal from the dismissal of the complaint against the Mortgage Associates and the Abstract Company and the Title Company did not appeal from the provision in the Chancery Division's judgment which directed that it shall no longer employ a non-lawyer to handle its tract construction loan payments.

In this court's earlier opinion (22 *N. J.* 184), Chief Justice Vanderbilt set forth the pertinent principles to which we fully subscribe and which represent the law of the case. As he pointed out, the privilege of engaging in the practice of the law is strictly confined to individual attorneys who have been duly licensed upon proper showings of character and competency and who are at all times subject to rigid rules of conduct. These restrictions are designed to serve the public interest by protecting "the unwary and the ignorant from injury at the hands of persons unskilled or unlearned in the law." See 22 *N. J.,* at *page* 195. The *Constitution of* 1947 vests in this court exclusive jurisdiction over the admission to the practice of law (*art.* 6, § 2, *par.* 3; 22 *N. J.,* at *page* 198) and while the Legislature may adopt a statute which penalizes the unlawful practice of the law (*N. J. S.*

2A:170–78) it may not constitutionally authorize the practice of the law by anyone not duly admitted to the bar by this court. See 22 *N. J.*, at *page* 198; *cf. In re Baker,* 8 *N. J.* 321, 336 (1951). A corporation may not be admitted to the bar and may not engage in conduct which amounts to the practice of the law "even as an incident to its lawful business." See 22 *N. J.*, at *page* 197.

It is, of course, clear that the practice of law is not confined to litigation but extends to legal activities in many non-litigious fields which entail specialized knowledge and ability. See *Unger v. Landlords' Management Corp.,* 114 *N. J. Eq.* 68, 71 (*Ch.* 1933); *People ex rel. Illinois State Bar Ass'n v. Schafer,* 404 *Ill.* 45, 87 *N. E.* 2d 773, 776 (*Sup. Ct.* 1949). Oftentimes the line between such activities and permissible business and professional activities by non-lawyers is indistinct. See *Auerbacher v. Wood,* 139 *N. J. Eq.* 599 (*Ch.* 1947), affirmed 142 *N. J. Eq.* 484 (*E. & A.* 1948). In the *Auerbacher* case Justice Heher noted that what constitutes the practice of law does not lend itself "to precise and all-inclusive definition" and that some fields may "in some areas" properly overlap the law (142 *N. J. Eq.,* at *page* 485); and in *Gardner v. Conway,* 234 *Minn.* 468, 48 *N. W.* 2d 788, 797 (*Sup. Ct.* 1951), Justice Matson noted that each individual set of circumstances must be passed upon "in a common-sense way which will protect primarily the interest of the public and not hamper or burden that interest with impractical and technical restrictions which have no reasonable justification." See also 55 *N. J. Super.,* at *page* 246. Courts have sometimes sought to distinguish between simple and complex legal work but this distinction appears to lack any real force. See *People v. Title Guarantee & Trust Co.,* 227 *N. Y.* 366, 125 *N. E.* 666 (*Ct. App.* 1919) (concurring opinion) where Judge Pound pointed out that "the most complex are simple to the skilled, and the simplest often trouble the inexperienced." 125 *N. E.,* at *page* 670. See also *People v. Lawyers Title Corporation,* 282 *N. Y.* 513, 27 *N. E.* 2d 30, 33 (*Ct. App.* 1940) and the concurring

438

opinion of Justice Donworth in *Washington State Bar Ass'n v. Washington Ass'n,* 41 *Wash. 2d* 697, 251 *P. 2d* 619 (*Sup. Ct.* 1953):

"I agree with the majority that there is no such thing as a simple legal instrument in the hands of a layman. A layman is not competent to determine whether a quitclaim deed, a warranty deed or a bargain and sale deed should be used in a particular case. Often, easements are involved arising either from specific grants or by prescription. These as well as other encumbrances must be taken into consideration by the scrivener. Conveyancing is a highly technical art which, in my opinion, should be engaged in only by licensed attorneys." 251 *P. 2d,* at *page* 628.

In their efforts to protect the public and to draw a commonsensible line between permissible and impermissible activities by laymen, the courts throughout the country have frequently differed in emphasis and result. Compare *Arkansas Bar Association v. Block,* 323 *S. W. 2d* 912 (*Ark. Sup. Ct.* 1959), *certiorari* denied 361 *U. S.* 836, 80 *S. Ct.* 87, 4 *L. Ed. 2d* 76 (1959) with *Conway-Bogue Realty Inv. Co. v. Denver Bar Ass'n,* 135 *Colo.* 398, 312 *P. 2d* 998 (*Sup. Ct.* 1957); see *Otterbourg, "A Study of Unauthorized Practice of Law," Unauthorized Practice News* (American Bar Association Sept. 1951); *Annotation, What amounts to practice of law,* 151 *A. L. R.* 781 (1944). For present purposes we need not concern ourselves with activities in any fields other than those actually engaged in by the Title Company but even here the opinions elsewhere diverge. Compare *Hexter Title & Abstract Co. v. Grievance Committee, etc.,* 142 *Tex.* 506, 179 *S. W. 2d* 946, 157 *A. L. R.* 268 (*Sup. Ct.* 1944); *Rattikin Title Company v. Grievance Committee,* 272 *S. W. 2d* 948 (*Tex. Civ. App.* 1954); *Pioneer Title Ins. & Trust Co. v. State Bar of Nevada,* 326 *P. 2d* 408 (*Nev. Sup. Ct.* 1958) and *Beach Abstract & Guaranty Co. v. Bar Ass'n of Arkansas,* 326 *S. W. 2d* 900 (*Ark. Sup. Ct.* 1959) with *La Brum v. Commonwealth Title Co. of Philadelphia,* 358 *Pa.* 239, 56 *A. 2d* 246 (*Sup. Ct.* 1948) and *Cooperman v. West Coast Title Company,* 75 *So. 2d* 818 (*Fla. Sup. Ct.* 1954).

In *Hexter Title & Abstract Co. v. Grievance Committee, etc., supra,* cited with approval by Chief Justice Vanderbilt in *In re Rothman,* 12 *N. J.* 528, 553 (1953), the Supreme Court of Texas dealt with a proceeding by a Grievance Committee of the State Bar of Texas to enjoin the alleged unlawful practice of the law by the defendant Hexter Title & Abstract Company, a corporation which was engaged in the title abstract business and also acted as agent for a title insurance company. Hexter had attorneys in its employ and they prepared deeds, notes, mortgages, releases and other instruments affecting the title to real estate in which Hexter was not acquiring any direct interest. The court held that these services constituted the unlawful practice of the law and must be enjoined. In the course of its opinion it dismissed the defendant's reference to the fact that no separate charge was made for the services by pointing to the general and covering charges made for title abstracts and title insurance; it dismissed the fact that the corporation had lawyers in its employ by pointing out that these lawyers acted as agents of the corporation to whom they owed their first loyalty and that "even though the corporation acts through an attorney, it is nevertheless practicing law"; and it disposed of the contention that the drawing of the instruments was a proper and lawful incident of the abstract business of the defendant and the title insurance business of its principal with the following remarks:

"In this connection, it should be noted that this suit does not involve the right of the corporation to prepare the contract of insurance to which the insurance company would be a party, nor does it relate to documents prepared to cover the release or discharge of the company from obligations previously incurred by it. These transactions involve conveyances, releases, and mortgages from grantors to grantees, and to which the insurance company is not a party. They are executed for the purpose of placing good title in the grantee, so that the insurance company may thereafter insure the title if it chooses. Such papers relate to the rights of third parties in which the corporation has no present interest, but only a prospective one. They affect the rights of individuals apart from their interest in the title insurance policy. The work of preparing these papers is dis-

tinct from the searching and insuring of the title—the legitimate business for which the corporation is incorporated. It is not the business of the title insurance company to create a good title in an applicant for insurance by preparing the necessary conveyances, nor to cure defects in an existing title by securing releases or prosecuting suits to remove clouds from title, merely for the purpose of putting the title in condition to be insured. The title insurance company must accept the title and insure it as it is, or reject it. It may examine the title, point out the defects, and specify the requirements necessary to meet its demands, but it is the business of the applicant for the insurance to cure the defects." 179 *S. W.* 2d, at *page* 952.

In *Title Guaranty Company v. Denver Bar Association,* 135 *Colo.* 423, 312 *P. 2d* 1011, 1014 (1957), the Supreme Court of Colorado dealt with a proceeding by the Colorado Bar Association (and others) to enjoin the defendants Title Guaranty Company and Record Abstract and Title Insurance Company from preparing for others certain legal documents, giving advice as to the legal effect of such documents, and performing other acts, all of which were alleged to constitute the unlawful practice of law. The Title Guaranty Company was in the business of making loans, certifying abstracts, and insuring titles and the Record Abstract and Title Insurance Company was in a similar business except that it made no loans. Both defendants prepared deeds, mortgages, releases and other instruments and performed escrow services. The lower court granted a broad injunction and on appeal the Supreme Court discussed three pertinent matters. First, it held that the lower court should not have enjoined the Title Guaranty Company from preparing notes and mortgages where it had loaned its own money and was named as payee and mortgagee; the court pointed out that "a layman or a corporation may prepare instruments to which he or it is a party without being guilty of the unauthorized practice of law." Secondly, the court held that the defendants could not lawfully render an escrow service for which they imposed a charge, where no title insurance was being written, and summarily rejected their position that "filling in of skeleton blanks, effecting the conveyance

or encumbering of property, such as a simple deed or mortgage, is generally regarded as the legitimate right of any layman." Thirdly, the court considered whether the defendants could, where parties either as owners or as mortgagees were obtaining title insurance, prepare "some or all of the 'closing documents' in connection with the transfer or mortgaging of the property and the issuance of title insurance." The court held that they could not and that the injunction below had properly been entered. It cited with approval and quoted extensively from *Hexter Title & Abstract Co. v. Grievance Committee, etc., supra;* it distinguished *La Brum v. Commonwealth Title Co. of Philadelphia, supra,* on the ground that "Pennsylvania does not consider preparation of papers of the type in question to be the practice of law" and that there no charge had been made for preparing the papers; and it rejected *Cooperman v. West Coast Title Company, supra,* pointing out that there the court had expressly limited its opinion to the facts before it, saying that "what we have written applies only to the performance of those acts which are indispensable to the determination of insurability and must not be construed as sanctioning a charge of any sort, in addition to the premium for the issuance of title insurance." *75 So. 2d,* at *page* 821.

In *Beach Abstract & Guaranty Co. v. Bar Ass'n of Arkansas, supra* [326 *S. W.* 2d 901], the Supreme Court of Arkansas recently dealt with a suit instituted by the Bar Association of Arkansas seeking a declaration that the activities of the defendants Beach Abstract and Guaranty Company and the Little Rock Abstract Company constituted the unauthorized practice of law. The defendants were engaged "in the preparation of abstracts of title, the solicitation and issuance of title insurance policies as general agents for title insurance companies, and in acting as escrow agents in connection with insuring titles and in closing real estate sales." In the course of their operations they drafted deeds, mortgages, affidavits and other legal instruments. No separate charges were made for the drafting of these instru-

ments although the defendants did receive for their escrow services, compensation based on the dollar volume of the transaction, and where a title insurance policy was obtained, the compensation received was that charged for the issuance of the policy. Insofar as the defendant Little Rock Abstract Company was concerned, the drafting of instruments was limited to the filling in of printed forms, which it did not prepare. In some instances the mortgagees for whom the defendants acted furnished the printed forms which they directed be used and the forms thus furnished were filled in by the defendants from data supplied by the mortgagees. The lower court found that the defendants' activities constituted the unauthorized practice of law and this finding was sustained in a unanimous opinion by the Supreme Court of Arkansas. In concluding his opinion for the court, Justice Johnson had this to say:

"This prohibition by us against others than members of the Bar of the State of Arkansas from engaging in the practice of law is not for the protection of the lawyer against lay competition but is for the protection of the public. The rights bestowed upon citizens of this country by the law and those rights inherent in the citizenship are the gauge of our freedom and of our civilized progress. They must be prized as such and the reciprocal obligation to honor the rights of others must be respected. Due respect for these rights and obligations requires that at all times they be susceptible of definition. This proposition lies at the very foundation of our system of law. The public interest, therefore, requires that in the securing of professional advice and assistance upon matters affecting one's legal rights, one must have assurance of competence and integrity and must enjoy freedom of full disclosure, with complete confidence in the undivided allegiance of one's counselor in the definition and assertion of the rights in question.

It is to meet the requirements of public interest that high standards of training and competence are fixed for those who would practice law, and that they practice under a strict code of professional ethics and are made answerable to the courts as court officers for the manner in which they meet their professional obligations. The legal profession has, through acceptance of its obligations, traditionally become imbued with a spirit of public service.

The bench and bar may not lightly disregard these public obligations. Nor, in default of duty, may they casually permit the public to be led to rely upon the counselling, in matters of law, of persons not subject to the standards and discipline of an attorney as im-

posed by law for the public protection. However, in view of what we have already said, we feel that it was not necessary for the Chancellor to issue an injunction against appellants, the declaratory judgment being sufficient.

In accordance with what we have said above, with the exception noted, the decision of the trial court is affirmed." 326 *S. W. 2d*, at *pages* 903–904.

■ In the light of the foregoing principles, we come to the Title Company's contention that none of its activities constituted the unauthorized practice of the law. Under point one of its brief it classifies its activities in three categories, the first involving transactions in which the Title Company itself is the mortgagee. Here the Title Company denies that it draws the deeds, sellers' affidavits or resolutions but acknowledges that it draws the bonds, mortgages and mortgagors' affidavits of title. It urges that these actions do not constitute the practice of the law "since they merely involve the drawing of legal instruments to which this defendant is a party." We assume, for present purposes, that where the Title Company is itself named as the mortgagee (see *Title Guaranty Company v. Denver Bar Association, supra*) it may justly be permitted to draw the bond and mortgage and the mortgagor's affidavit of title provided it imposes no charge on the purchaser for such services. *Cf. Hobson v. Kentucky Trust Co. of Louisville,* 303 *Ky.* 493, 197 *S. W. 2d* 454, 461 (1946). The Title Company here takes the position that it imposed no charge but the evidence satisfies us to the contrary, though the charge was not separately designated. The fees paid by purchasers for "search and title abstracting" were far in excess of the cost to the Title Company of the search and abstract and may fairly be taken as covering the Title Company's charges for the unspecified incidental services rendered by it. Compare *Hexter Title & Abstract Co. v. Grievance Committee, etc., supra:*

"No separate charge is made for the services above referred to. The defendant apparently advertises and holds itself out as furnish-

ing this legal service without charge. However, it is not true in fact that such services are furnished free of cost to the customer. This legal service is advertised as a leader to induce prospective customers to come in and transact other business in which there is greater profit. It is offered as an inducement to contract for an abstract of title, for which a direct charge is made, or to allow the defendant's principal to insure the title to the property involved, for which the defendant receives a commission. The furnishing of such legal services constitutes a part of the cost of obtaining the business transacted by the defendant. Evidently it pays, or the practice would be discontinued. It constitutes a part of the total service for which the customers pay. There is therefore 'a consideration, reward, or pecuniary benefit' flowing to the defendant for the legal services so rendered. See *McDonald v. Leonard Bros.*, Tex. Civ. App., 134 S. W. 2d 460; *Dallas Hotel Co. v. Richardson*, Tex. Civ. App., 276 S. W. 765; *State ex inf. Miller, Circuit Atty., v. St. Louis Union Trust Co.*, 335 Mo. 845, 74 S. W. 2d 348, 356; *Herbert v. Shanley Co.*, 242 U. S. 591, 37 S. Ct. 232, 61 L. Ed. 511; 5 Tex. Jur., p. 1015, § 5; 19 *C. J. S., Corporations*, § 956, p. 407, note 17." 179 *S. W. 2d*, at *page* 952.

The second category discussed by the Title Company involves transactions in which the Title Company was acting for other lending institutions in the placing of mortgages. Here it states that it fills in "blanks in bond and mortgage forms approved by other mortgagees" and contends that this does not constitute the unauthorized practice of law. We disagree. The drawing of legal instruments by the Title Company for others (particularly, where as here, it is compensated) is clearly within the traditional definition of the practice of law and nonetheless so where the drawing consists in the filling in and completion of legal forms. See *Beach Abstract & Guaranty Co. v. Bar Ass'n of Arkansas*, supra; *Title Guaranty Company v. Denver Bar Association*, supra; *People v. Lawyers Title Corporation*, supra; cf. *Washington State Bar Ass'n v. Washington Ass'n*, supra, 251 *P. 2d*, at *page* 621. In *People v. Lawyers Title Corporation*, supra, the court, citing Judge Pound's concurring opinion in *People v. Title Guarantee & Trust Co.*, supra, summarily rejected the argument that the "papers were simple and not complex and that the blanks might as well be filled in by one not skilled in legal work as by a lawyer."

27 *N. E. 2d,* at *page* 33. In *Washington State Bar Ass'n v. Washington Ass'n, supra,* the court noted that "any legal form must be adapted skillfully to the transaction for which it is used, so that it expresses the agreement of the parties and defines their rights and obligations," and that "doing this is work of a legal nature" and may not be done by one who is unqualified. 251 *P. 2d,* at *page* 621. See *Arkansas Bar Association v. Block, supra,* 323 *S. W. 2d,* at *page* 914.

██ The third category discussed by the Title Company relates to its "insuring titles and causing searches and abstracts to be made." We agree that it may, in pursuance of its lawful business activities, insure titles and cause searches and abstracts to be made; and we also agree that it may have a legal representative to protect its interests at the title closings, although it is regrettably noted that in approximately 50 per cent of the past closings the purchasers had no independent counsel and in approximately 10 per cent of the closings the sellers had no independent counsel. The real difficulties arise where, as the evidence here indicates, the Title Company participates in clearing objections to title, which necessarily involves some legal opinion and activity, and also imposes a charge (apart from the title insurance premium, the recording fees, *etc.*) for "search and title abstracting" in an amount far exceeding its actual cost for search and abstract. We hold the opinion that while the Title Company may properly voice its objections to the title and not issue its title policy or lend its money on mortgage until the objections have been removed, it may not participate in the preparation of legal instruments or in the taking of other legal steps necessary to remove the objections to the title or to cure the defects therein. See *Hexter Title & Abstract Co. v. Grievance Committee, etc., supra; cf. Rattikin Title Company v. Grievance Committee, supra; Pioneer Title Ins. & Trust Co. v. State Bar of Nevada, supra; Beach Abstract & Guaranty Co. v. Bar Ass'n of Arkansas, supra; Title Guaranty Company v. Denver Bar Association, supra.* And we are satisfied that under

the circumstances presented here it may not fairly be permitted to impose its charge for "search and title abstracting" in excess of the actual cost to the Title Company of the search and abstract. *Cf. Hexter Title & Abstract Co. v. Grievance Committee, etc., supra; Title Guaranty Company v. Denver Bar Association, supra.*

Under point two of its brief the Title Company contends that its practices "are authorized by statute and, therefore, do not constitute the unauthorized practice of law." It cites *N. J. S.* $2A$:170–81($c$) as "at least impliedly" authorizing its activities under the first general category, *R. S.* 14:3–3, *N. J. S.* $2A$:170–81($a$) and *N. J. S. A.* 17:24–7 as authorizing its activities under the second general category and *N. J. S. A.* 17:17–1($h$) as authorizing its activities under the third general category. While we have given respectful consideration to such legislative views as may be gathered from the cited statutes, we need do no more than reiterate our earlier holding that the Constitution of 1947 vests in this court exclusive jurisdiction over the admission to the practice of law and that· the Legislature may not constitutionally authorize the practice of the law by anyone not duly admitted to the bar by this court. See 22 *N. J.,* at *page* 198. Many judicial opinions elsewhere give recognition to the principle that the Legislature may not constitutionally authorize corporations or individuals not licensed to practice law to engage in conduct defined by the courts as constituting the practice of law. See *Arkansas Bar Ass'n v. Union Nat. Bank of Little Rock,* 224 *Ark.* 48, 273 *S. W.* 2*d* 408, 412 (*Sup. Ct.* 1954); *cf. In re Opinion of the Justices,* 279 *Mass.* 607, 180 *N. E.* 725, 81 *A. L. R.* 1059 (1932); *Rhode Island Bar Ass'n v. Automobile Service Ass'n,* 55 *R. I.* 122, 179 *A.* 139, 100 *A. L. R.* 226 (1935); *People ex rel. Chicago Bar Ass'n v. Goodman,* 366 *Ill.* 346, 8 *N. E.* 2*d* 941, 111 *A. L. R.* 1 (1937), *certiorari* denied 302 *U. S.* 728, 58 *S. Ct.* 49, 82 *L. Ed.* 562 (1937), rehearing denied 302 *U. S.* 777, 58 *S. Ct.* 138, 82 *L. Ed.* 601 (1937); *Application of Kaufman,* 69 *Idaho* 297, 206 *P.*

2*d* 528 (*Sup. Ct.* 1949); *State Bar Association of Connecticut v. Connecticut Bank & Trust Co.*, 145 *Conn.* 222, 140 *A.* 2*d* 863 (*Sup. Ct. Err.* 1958).

Finally, the Title Company contends that the public policy of this State compels the judicial conclusion that its activities do not constitute the unauthorized practice of the law. We have, earlier in this opinion, set forth the activities of the Title Company which we have found to constitute unauthorized practice and they will be enjoined. To the extent that this action serves to remove unwarranted charges imposed by the Title Company on purchasers and to encourage parties to obtain the important protection of independent counsel, the public interest will not be disserved but on the contrary will be significantly advanced. See *Arkansas Bar Association v. Block, supra,* 323 *S. W.* 2*d,* at *pages* 914–916.

 The Mortgage Associates and the Abstract Company appeal from the taxation of costs against them, contending that since there was no final determination and injunction against them no costs should be taxed. Unlike *Dolan Dining Co., Inc. v. Cooks', etc., Local No. 399,* 128 *N. J. Eq.* 210 (*E. & A.* 1940), the evidence introduced here disclosed that there was ample cause for the State Bar Association's action against the Mortgage Associates and the Abstract Company. The transfer of their assets to the Title Company during the course of the proceedings may have rendered unnecessary any final determination and injunction but in no wise deprived the Chancery Division of its power to tax costs against them. See *General Leather, etc., Inc. v. Luggage, etc., No. 49,* 119 *N. J. Eq.* 432 (*Ch.* 1936), appeal dismissed 121 *N. J. Eq.* 101 (*E. & A.* 1936). The allowance of costs is largely discretionary and we find no basis whatever for interfering with the court's exercise of discretion here. See *In re Caruso,* 18 *N. J.* 26, 38 (1955). The judgment for costs against the Mortgage Associates and the Abstract Company is affirmed and the judgment in favor of the Title Company is:

Reversed and the cause is remanded to the Chancery Division for the entry of an injunction in conformity with this opinion.

No. 98:

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.

No. 99:

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.