733 A.2d 478

IN THE MATTER OF OPINION 33 OF THE COMMITTEE
ON THE UNAUTHORIZED PRACTICE OF LAW.

Argued May 4, 1999—Decided July 21, 1999.

*Joseph L. Yannotti*, Assistant Attorney General, argued the cause for appellants Attorney General of New Jersey and James A. DiEleuterio, Jr., State Treasurer (*Peter Verniero*, Attorney General of New Jersey, attorney; *Clifford T. Rones*, Deputy Attorney General, on the briefs).

*Elizabeth J. Sher*, argued the cause for respondent, Supreme Court Committee on the Unauthorized Practice of Law (*Pitney, Hardin, Kipp & Szuch*, attorneys; *Ms. Sher* and *Paul B. Macchia*, on the briefs).

*Geoffrey C. Hazard, Jr.*, a member of the Connecticut, California and Pennsylvania bars, argued the cause for *amicus curiae* National Association of Bond Lawyers (*Michael P. Ambrosio*, attorney).

*Joseph A. Bottitta* and *John L. Kraft,* argued the cause for *amicus curiae* New Jersey State Bar Association (*Mr. Bottitta* and *Mr. Kraft,* attorneys; *Raymond A. Noble,* on the brief).

*Steven D. Weinstein,* submitted a brief on behalf of *amicus curiae* Blank Rome Comisky & McCauley, LLP (*Blank Rome Comisky & McCauley,* attorneys; *Mr. Weinstein* and *Elizabeth S. Washko,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

In Opinion No. 33 (Opinion 33) the Committee on the Unauthorized Practice of Law (Committee) concluded that "attorneys who are not admitted to practice law in New Jersey are engaged in the unauthorized practice of law when they advise New Jersey governmental bodies in connection with the issuance of state and municipal bonds." We granted the Petition for Review filed on behalf of the Attorney General and the State Treasurer. We hold that the Committee's determination is overbroad and not adequately reflective of the variety of factors that affect the public interest in the regulation of bond counsel services. Accordingly, we modify the Committee's Opinion 33.

I

The background events that led up to the issuance of Opinion 33, 153 *N.J.L.J.* 184, 7 *N.J.L.* 1584 (July 13, 1998), inform the Court's disposition of this appeal. The unique aspect of this controversy is historical: for most of this century bond counsel services rendered to New Jersey public entities engaged in debt issuance were performed exclusively by out-of-state law firms as a matter of necessity. The New Jersey State Bar Association (NJSBA), which initiated the request for the Committee's advisory opinion, has acknowledged that the "use of foreign law firms and lawyers unlicensed in New Jersey [to perform bond counsel services] was a matter of necessity," observing that in the past "New Jersey lawyers lacked the expertise and national recognition

to provide the legal services and render the legal opinions required when the State and its agencies issued bonds."

Within the past two decades, a substantial number of New Jersey law firms have developed the necessary expertise and experience to perform bond counsel services for governmental issuers. We note that *The Bond Buyer's Municipal Marketplace Directory,* Fall 1998 edition, published by The Bond Buyer's Municipal Marketplace Group (*Bond Buyer's Directory* or *Directory* ), lists fifty-five New Jersey law firms under the heading of Municipal Bond Attorneys. The requirements for inclusion in the list of municipal bond attorneys are that the law firm, during the two-year period preceding publication, "rendered a sole legal opinion in connection with the sale of state and/or municipal bonds, or served as underwriter's counsel, co-counsel or issuer's counsel for a municipal bond offering." Accordingly, the list of qualified New Jersey municipal bond attorneys undoubtedly reflects substantial variation in the actual expertise and experience among the listed firms. In addition, the Bond Buyers Directory includes a ranking of the top one hundred municipal bond attorneys throughout the country based on the principal amount of long-term issues (maturities of thirteen months or longer) in which the firm was involved. The top-rated firm on the list was involved in 379 bond issues aggregating approximately $24,617,400,000 in principal amount. Three New Jersey law firms were included in the top one hundred firms, and the highest-ranked New Jersey law firm was involved in nineteen bond issues aggregating approximately $1,189,500,000 in principal amount. In addition, six New Jersey law firms were included in the top 100 law firms handling short-term bond issues. The information in the *Bond Buyer's Directory* suggests that perhaps a group of approximately ten to twenty law firms throughout the country continue to enjoy a significantly greater national recognition for expertise and experience as bond attorneys than that of any New Jersey law firm qualified to perform bond counsel services. The *Directory* also indicates that of the growing number of New Jersey law firms that have acquired sufficient experience in bond counsel matters

to warrant inclusion in the *Directory,* some of the leading New Jersey law firms appear to have made substantial progress toward achieving broad recognition and stature for their work as bond counsel.

In the mid–1990's, the NJSBA became increasingly concerned about the continued use of out-of-state bond counsel firms by New Jersey public entities. In 1994, Governor Whitman appointed an Advisory Panel on Government Contracting Procedures (Advisory Panel) consisting of the Attorney General, the State Treasurer and the Governor's Chief Counsel. The Governor directed the Advisory Panel to reconsider the State's procedures when engaging in the issuance of bonds as well as the mechanism for selecting underwriters, bond counsel, and other professional advisors. In May 1994, the NJSBA wrote to the Advisory Panel and recommended that the Panel "act to end the retention of out-of-state lawyers to serve as bond counsel to the State of New Jersey and the various state agencies that issue bonds and other obligations." In its Report to the Governor issued in July 1994, the Advisory Panel addressed the issue of out-of-state bond counsel:

> We note with concern the issue raised with respect to the appointment of "out-of-state" firms for bond counsel services. Questions were raised as to the legality or propriety of "out-of-state" firms performing legal services for the State. The Attorney General indicates that a preliminary review of the materials submitted in support of this contention suggests that the law in this area is unsettled. The Attorney General notes that there is no formal opinion that is directly on point in the State of New Jersey. Therefore, the Attorney General has advised that her office will seek a ruling from the New Jersey Supreme Court Committee on the Unauthorized Practice of Law in regard to this issue and that she will prepare submissions to aid the Supreme Court Committee in its review. In any event, we recommend that, in establishing policies and procedures for the selection of bond counsel, issuers provide particular consideration for New Jersey law firms.
>
> It is, therefore, the view of this Panel that counsel be selected pursuant to an established set of criteria that include price as a factor.

In March 1995, the Attorney General promulgated written guidelines for the selection of bond counsel, applicable to the State and its agencies and authorities, that set forth criteria to be used in the selection process including experience with similar transactions, familiarity with relevant state laws, proficiency with relevant

federal securities and tax laws, quality of past service, and antici-
pated fee. Guidelines of the Attorney General for the Selection of
Bond Counsel Under Executive Order No. 26 (Guidelines). The
Guidelines required that, apart from extraordinary circumstances,
only New Jersey law firms be considered in the selection process:

> In the selection of bond counsel each issuer and the Attorney General will provide
> particular consideration for New Jersey law firms and minority-owned and women-
> owned law firms. To this end, it is the policy of the Attorney General that, except
> in extraordinary circumstances, consideration will be given only to those firms with
> a *"bona fide"* office in New Jersey, as such term is defined in *R.* 1:21–1(a). Each
> RFP will solicit the following information:
>
> 1. The location of each office of the firm noting the number of attorneys resident
>    in each office, whether they are partners or associates and the areas of law
>    they practice; and
>
> 2. The participation of women and minorities in the firm, including the number of
>    women partners and associates and minority partners and associates.

However, although the Attorney General's Guidelines were pro-
mulgated pursuant to Executive Order No. 26 issued in October
1994, that Executive Order required only that issuers give "partic-
ular consideration" to New Jersey law firms, and did not restrict
issuers from retaining out-of-state law firms as bond counsel.

Apparently dissatisfied with the response of the State to their
concerns about out-of-state bond counsel, the NJSBA in February
1997 formally requested the Committee to render an advisory
opinion on the following question: Whether attorneys who are not
admitted to the Bar of New Jersey engage in the unauthorized
practice of law when they render legal services as bond counsel to
governmental units in New Jersey, including the State of New
Jersey? In July 1998, the Committee issued Opinion 33 in which
it concluded that "attorneys who are not admitted to practice law
in New Jersey are engaged in the unauthorized practice of law
when they advise New Jersey governmental bodies in connection
with the issuance of state and municipal bonds." In reaching that
conclusion, the Committee emphasized that the functions per-
formed by bond counsel for New Jersey issuers primarily involve
New Jersey law and that currently no need exists to permit out-
of-state lawyers to perform bond-counsel services in New Jersey:

These are not "multi-state transactions." There are no "inseparable" elements located in different states. There are no "tangled and interwoven elements" from different jurisdictions. On the contrary, the New Jersey bond issues are home-grown, Garden State-only matters. These matters involve only New Jersey—New Jersey facts, New Jersey governments, New Jersey bonds, New Jersey law. The only non-New Jersey element involved in bond practice is federal tax law. Because New Jersey bond lawyers are equally as skilled in federal tax law as foreign bond counsel—and federal tax law, by definition, does not vary from state to state—there is no need for New Jersey to permit the unauthorized practice of law by foreign attorneys whose primary practice is outside the State.

In addition, the Committee noted this Court's observation in *In re Opinion No. 26 of the Committee on the Unauthorized Practice of Law*, 139 *N.J.* 323, 340, 654 *A.*2d 1344 (1995), that "the determination of whether someone should be permitted to engage in conduct that is arguably the practice of law is governed ... by asking whether the public interest is disserved by permitting such conduct." The Committee concluded, however, that the "public interest" standard is inapplicable to the performance of bond counsel services in New Jersey by out-of-state law firms. The Committee distinguished the materiality of the public interest standard in *In re Opinion 26, supra*, noting that in that proceeding the issue concerned a party's right to proceed without any counsel, not with out-of-state counsel, and also that *In re Opinion 26* dealt with activities by lay persons that pertained to the practice of law. Accordingly, the Committee declined to apply the public interest standard to test the validity of its conclusion in Opinion 33.

The Committee also addressed the question whether lawyers unlicensed in New Jersey may perform bond counsel services while employed by a multi-state firm with a New Jersey office:

Even where an out-of-state firm has opened a New Jersey office, it is still the unauthorized practice of law if the lawyers in that office performing the legal services are not licensed in the State of New Jersey. Opening an office in New Jersey does not grant a license to practice law in this State to the entire legal staff of the out-of-state law firm—each attorney must be individually licensed to practice law in New Jersey.

During oral argument of this appeal, however, counsel for the Committee acknowledged that out-of-state lawyers properly could be engaged by New Jersey bond counsel to consult on matters

relating to New Jersey bond issues and could participate directly in meetings within New Jersey attended by New Jersey counsel and their clients. The Committee's counsel also acknowledged that the Committee's characterization of New Jersey bond counsel practice as involving "Garden State-only matters" was an oversimplification, conceding that certain bond issues involve complex issues of federal law and implicate concerns that require consideration of legal principles not limited to New Jersey law.

The Attorney General, on his own behalf and on behalf of the State Treasurer, filed a Notice of Petition for Review of Opinion 33 and moved to stay application of the Opinion and to remand the matter to the Committee to supplement the record. The application for a stay being unopposed, this Court stayed application of Opinion 33 pending our final resolution of this appeal. We also granted the Petition for Review, and granted the National Association of Bond Lawyers (NABL) and the law firm of Blank, Rome, Comiskey & McCauley leave to appear separately as *amicus curiae*. We deferred disposition of the Attorney General's remand motion pending our disposition of this appeal.

## II

Before we address the legal principles that bear on our resolution of this appeal, we take note of the supplemental factual contentions included in certifications supporting the Attorney General's motion for summary remand and in the briefs filed by *amici*. The certification of James A. DiEleuterio, Jr., the State Treasurer, described two specific state bond issue transactions of unusual complexity. The first was the $2.8 billion State Pension Funding Bonds, Series 1997A–1997C (the "State Pension Bond Issue"), issued by the New Jersey Economic Development Authority (EDA) to finance the unfunded, accrued pension liability of the State's various retirement systems. The Certification described the State Pension Bond Issue as the largest bond issue ever offered by a state issuer and the first such issue to be distributed worldwide and offered in "retail" denominations of twenty-five

dollars per bond. Because of the size, novelty and complexity of the bond issue, State officials retained two law firms, a New Jersey firm and a Philadelphia firm with a New Jersey office. The lead attorney in the Philadelphia firm who performed significant legal services concerning the State Pension Bond Issue was not licensed in New Jersey. The Treasurer's certification stated that "[o]ther firms with New Jersey licensed counsel did have the requisite experience but were disqualified based upon their representation of the State Pension Bond underwriters in other bond transactions."

The Treasurer's Certification also referred to the "Swaption Transaction" in process in August 1998, pursuant to which the EDA, for a premium, would sell the future right to enter into a "swap" agreement commencing June 2002 with respect to the $375,000,000 Series 1997C Pension Bonds. Because the Swaption Transaction was difficult and complex and required familiarity with the underlying pension bond issue, the State retained the same two law firms that handled the State Pension Bond Issue to serve as bond counsel for that transaction.

An additional certification in support of the motion for remand was submitted by Caren S. Franzini, the Executive Director of the EDA. Franzini described five discrete bond-issue transactions in which the EDA was involved and for which bond counsel selected by the EDA included multi-state firms with New Jersey offices in which the lawyers assigned to the work included lawyers unlicensed in New Jersey. The five bond-issue transactions consisted of the following: the State Office Building Transactions, designed to finance through bond issues the cost of acquisition or rehabilitation of various state properties; the Structured Financing Transactions, described as "sophisticated leasing transactions [that] provide tax and balance sheet advantages to the borrowers" and involve EDA bond issues for the benefit of various entities; the MSNBC Transaction, a novel structured financing transaction to finance the acquisition of machinery and equipment by affiliates of NBC and Microsoft; a financing transaction related to the

MSNBC Transaction in which the EDA will sell depreciation rights in the purchased machinery and equipment; and the "Conduit" Bond Issue Transactions, in which the EDA issues bonds and lends the proceeds to a borrower who assumes all responsibility for debt service. Concerning the Conduit Transactions, the EDA selected two "pools" of law firms to serve as bond counsel, most of which are New Jersey firms but some are multi-state firms in which lawyers unlicensed in New Jersey may be assigned to perform some of the required legal services. The Franzini Certification asserts that the bond issues described therein, other than the Conduit Bond Issues, involved questions of such difficulty and complexity that the retention of multi-state firms, in which lawyers unlicensed in New Jersey would participate in the representation, was necessary and justified.

The *amicus curiae* brief of the National Association of Bond Lawyers, as well as the oral argument presented on their behalf, did not contest the premise that a non-New Jersey law firm could not serve alone as bond counsel for a New Jersey governmental issuer. However, the NABL urged that New Jersey bond counsel should be permitted to engage attorneys unlicensed in New Jersey in that firm or qualified out-of-state firms to provide expert advice and services to the New Jersey bond counsel and the governmental issuer, and that direct consultation with the governmental issuer by such attorneys also should be permitted. The NABL emphasized the growing complexity and multi-disciplinary character of public finance law in support of its view that New Jersey bond counsel should be permitted to consult with out-of-state lawyers:

> Because the practice of public finance law is multi-disciplinary, the participation of non-New Jersey Counsel in areas such as federal securities law, federal tax law, federal bankruptcy law, federal banking law, federal environmental law, national and international conventions, model documentation regarding certain derivative financial products, and state securities laws, when warranted and when a New Jersey lawyer is involved in the transaction, will result in the governmental entity and the investors receiving the most competent and comprehensive legal advice and, therefore, will further the public interest. Prohibiting a New Jersey lawyer or governmental issuer from consulting and conferring directly with non-New

Jersey Counsel serves no public interest and has abundant potential for negative consequences.

. . . .

Furthermore, states, counties, cities and other political subdivisions have become increasingly sophisticated in the types of bonds issued and in the security arrangements or sources of payment for bonds. Historically all bonds were issued with a fixed, stated interest rate, and paid interest on a specific periodic basis. Bonds issued in today's more sophisticated market often are issued with variable or floating rates, with various interest rate methods of interest rate determination, and with provisions granting the purchaser the right to tender bonds in certain instances. Issuers have also added to the complexity by issuing bonds secured not only by a pledge of the issuer's general credit or taxing power, or by traditional revenue sources such as water and sewer system revenues, but also by such items as pledges of special taxes or assessments, golf course fees, passenger facility charges at airports or stadium receipts, or other similar receipts.

In a similar fashion, the nature of the purchasers of bonds has changed as well.... [M]any bonds are purchased today by large institutional investors, particularly mutual funds, that buy bonds issued by issuers located in a number of states. The market for bonds therefore is a national market and has resulted in investors becoming even more insistent on receiving an opinion of knowledgeable and experienced Bond Counsel. Access to Bond Counsel with relevant expertise in specialized areas of law is essential to assuring that prospective issuers will have access to underwriters and purchasers of their debt, many of whom may have no connection to the state where the issuer is located.

## III

This Court's jurisprudence has adhered to a consistent standard when determining whether a specific practice constitutes the unauthorized practice of law. In *In re Opinion 26, supra*, 139 *N.J.* at 340, 654 *A.*2d 1344, we described that standard in simple and pragmatic terms:

Practically all of the cases in this area are relatively recent. They consistently reflect the conclusion that the determination of whether someone should be permitted to engage in conduct that is arguably the practice of law is governed not by attempting to apply some definition of what constitutes that practice, but rather by asking whether the public interest is disserved by permitting such conduct. The resolution of the question is determined by practical, not theoretical, considerations; the public interest is weighed by analyzing the competing policies and interests that may be involved in the case; the conduct, if permitted, is often conditioned by requirements designed to assure that the public interest is indeed not disserved.

Our earliest precedents are faithful to that formulation. In *Auerbacher v. Wood*, 142 *N.J.Eq.* 484, 59 *A.*2d 863 (E. & A.1948), the Court of Errors and Appeals determined that an individual participating in the practice of consulting in industrial relations and personnel management was not engaged in the unauthorized practice of law, observing that "[w]hat constitutes the practice of law does not lend itself to precise and all-inclusive definition." *Id.* at 485, 59 *A.*2d 863. In drawing the line between permissible and impermissible activities, the Court observed that

> guidance is to be found in the consideration that the licensing of law practitioners is not designed to give rise to a professional monopoly, but rather to serve the public right to protection against unlearned and unskilled advice and service in matters relating to the science of the law.
>
> [*Id.* at 486, 59 *A.*2d 863.]

Although reaching a different legal conclusion on the central issue, this Court reiterated its adherence to the public interest standard in *New Jersey State Bar Ass'n v. Northern New Jersey Mortgage Associates*, 32 *N.J.* 430, 161 *A.*2d 257 (1960). In that appeal the Court concluded that a title company that charged fees for its services in preparing bonds, mortgages and affidavits of title, and for preparing legal instruments necessary to remove or cure title defects, was engaged in the unauthorized practice of law. Justice Jacobs, writing for a unanimous Court, noted that "the line between such activities and permissible business and professional activities by non-lawyers is indistinct," *id.* at 437, 161 *A.*2d 257, and observed that "each individual set of circumstances must be passed upon 'in a common-sense way which will protect primarily the interest of the public and not hamper or burden that interest with impractical and technical restrictions which have no reasonable justification,'" *ibid.* (quoting *Gardner v. Conway*, 234 *Minn.* 468, 48 *N.W.*2d 788, 797 (1951)). The Court concluded that by enjoining the questioned practices, "the public interest will not be disserved but on the contrary will be significantly advanced." *Id.* at 447, 161 *A.*2d 257.

We also applied the public interest standard in *In re Education Law Center, Inc.*, 86 *N.J.* 124, 429 *A.*2d 1051 (1981). Reversing

the Committee on the Unauthorized Practice of Law we held that, despite the long-standing prohibition against the practice of law by corporations, a non-profit corporation engaged in law practice as a public interest law firm would not be engaged in the unauthorized practice of law if it adhered to the conditions imposed by the Court. *Id.* at 139, 429 *A*.2d 1051. Those conditions were intended to minimize the possibility of interference by non-lawyer members of the corporation's board of directors with the provision of legal services by lawyers employed by the corporation. *Id.* at 138–39, 429 *A*.2d 1051. Noting the vital contributions to the public interest that such law firms have made and will continue to make, we stated that

[c]onsiderations of public policy thus lead us to conclude that if other considerations impel such entities to organize as non-profit corporations, it may be possible for such corporations to practice law, provided certain rigorous standards are met, notwithstanding the general prohibition of *R*. 1:21–1(c).

[*Id.* at 137, 429 *A*.2d 1051.]

A compelling illustration of the overriding influence of the public interest in resolving unauthorized-practice-of-law issues is provided by this Court's decision in *New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Boards,* 93 *N.J.* 470, 461 *A*.2d 1112 (1983). Approving a settlement between real estate brokers and the Bar reached with the assistance of retired Supreme Court Justice Mark A. Sullivan, Jr., sitting as the trial judge, we held that real estate brokers may prepare contracts for the sale of residential property provided that they contain a prominent notice to parties of their right, through counsel, to cancel the contract within three days. Justice Sullivan found the settlement to be consistent with the public interest and, in affirming the settlement, this Court concluded that the record supported the trial court's determination that the settlement would "protect the public interest." *Id.* at 473, 461 *A*.2d 1112. The delicacy of the issue thereby resolved was highlighted by the dissenting opinion that observed: "The Court implicitly acknowledges that the realtors will be practicing law, as well it must." *Id.* at 483, 461 *A*.2d 1112 (Schreiber, J., dissenting). But as the Court noted in *In re Opinion 26, supra,*

139 *N.J.* at 349, 654 *A.*2d 1344, commenting on our approval of the settlement in *New Jersey Ass'n of Realtor Boards*:

> The significance of the resolution of the case lies not only in the reaffirmation of the public interest standard, and its achievement through the imposition of conditions, but in the enormous practical importance of the decision in terms of the interest groups involved, the initial adversarial contest that so clearly exposed the issues, and ultimately the compelling strength of the public interest standard not simply in abstract terms, but in view of the very large number of citizens affected.

More recently, in *In re Application of the New Jersey Society of Certified Public Accountants*, 102 *N.J.* 231, 242–43, 507 *A.*2d 711 (1986), we modified Opinion No. 10 of the Committee on the Unauthorized Practice of Law

> to permit the preparation and filing of New Jersey Inheritance Tax Returns by qualified certified public accountants licensed in New Jersey provided that the accountant notifies the client in writing before work is commenced that review of the return by a qualified attorney may be desirable because of the possible application of legal principles to the preparation of the tax return.

In reaching that conclusion, we emphasized that "in cases involving an overlap of professional disciplines we must try to avoid arbitrary classifications and focus instead on the public's realistic need for protection and regulation." *Id.* at 237, 507 *A.*2d 711.

Finally, in *In re Opinion No. 26, supra*, 139 *N.J.* 323, 654 *A.*2d 1344, this Court concluded that the "South Jersey practice" of closing residential real estate transactions without the presence of counsel could continue and that brokers and title officials participating in such transactions would not be engaged in the unauthorized practice of law provided that the parties are adequately informed of the true interests of the broker and title company as well as the risks involved in proceeding without counsel. In reaching that conclusion we acknowledged that "many aspects of such transactions constitute the practice of law ... including some of the activities of these brokers and title officers." *Id.* at 326, 654 *A.*2d 1344. Nevertheless, in sustaining the South Jersey practice we were guided by the traditional public interest standard that has been the focus of our jurisprudence concerning the unauthorized practice of law. As we explained:

> The question before us is whether brokers and title company officers, who guide, control and handle all aspects of residential real estate transactions where neither

seller nor buyer is represented by counsel, are engaged in the unauthorized practice of law. That many aspects of such transactions constitute the practice of law we have no doubt, including some of the activities of these brokers and title officers. Our power to prohibit those activities is clear. We have concluded, however, that the public interest does not require such a prohibition. Sellers and buyers, to the extent they are informed of the true interests of the broker and title officer, sometimes in conflict with their own interests, and of the risks of not having their own attorney, should be allowed to proceed without counsel. The South Jersey practice, for it is in that part of the state where sellers and buyers are most often unrepresented by counsel in residential real estate transactions, may continue subject to the conditions set forth in this opinion. By virtue of this decision, those participating in such transactions shall not be deemed guilty of the unauthorized practice of law so long as those conditions are met. Our decision in all respects applies not only to South Jersey, but to the entire state.

. . . .

The question of what constitutes the unauthorized practice of law involves more than an academic analysis of the function of lawyers, more than a determination of what they are uniquely qualified to do. It also involves a determination of whether non-lawyers should be allowed, in the public interest, to engage in activities that may constitute the practice of law. As noted later, the conclusion in these cases that parties need not retain counsel to perform limited activities that constitute the practice of law and that others may perform them does not imply that the public interest is thereby advanced, but rather that the public interest does not require that those parties be deprived of their right to proceed without counsel. We reach that conclusion today given the unusual history and experience of the South Jersey practice as developed in the record before us.

We determine the ultimate touchstone—the public interest—through the balancing of the factors involved in the case, namely, the risks and benefits to the public of allowing or disallowing such activities. In other words, like all of our powers, this power over the practice of law must be exercised in the public interest; more specifically, it is not a power given to us in order to protect lawyers, but in order to protect the public, in this instance by preserving its right to proceed without counsel.

[139 *N.J.* at 326–27, 654 *A.*2d 1344.]

## IV

### A

■ Under our Constitution, this Court possesses the comprehensive power to regulate the practice of law, *N.J. Const.* art. VI, § 2, ¶ 3, including "the power to permit the practice of law and to prohibit its unauthorized practice," *In re Opinion No. 26, supra,* 139 *N.J.* at 326, 654 *A.*2d 1344. *Rule* 1:21–1(a) provides that only

attorneys admitted in New Jersey are authorized to practice law in this State:

> [N]o person shall practice law in this State unless that person is an attorney holding a plenary license to practice in this State, has complied with the *Rule* 1:26 skills and methods course requirement in effect on the date of the attorney's admission, is in good standing, and maintains a bona fide office for the practice of law in this State regardless of where the attorney is domiciled.

■ In Opinion 33 the Committee characterized bond counsel as "lawyers engaged to provide an expert and objective legal opinion with respect to the validity of bonds and other subjects, particularly the tax treatment of interest on the bonds." Relying on a NABL publication entitled *The Function and Professional Responsibilities of Bond Counsel* (2d ed.1995), the Committee summarized the primary functions performed by bond counsel:

(1) supervising the bond proceedings, including preparing documents and drafting or reviewing enabling legislation or constitutional amendments;

(2) preparing or reviewing the form of offering, disclosure, or continuing disclosure document to be distributed in connection with the bonds;

(3) assisting the issuer or others in obtaining approvals, rulings, permissions and exemptions from governmental authorities as deemed necessary by counsel;

(4) pursuing validation proceedings or test cases or participating in relevant litigation;

(5) preparing a mortgage, security agreement or other document related to the bonds; and

(6) rendering opinions on related matters such as:

   a) federal and state securities laws;

   b) eligibility of bonds for investment by regulated investors;

   c) the status of the bonds and related obligations under creditors' rights laws; and

   d) the validity and enforceability of security agreements, indentures and related documents.

Based on its description of the nature of bond counsel services, the Committee concluded that "[t]here is no doubt that the services provided by bond counsel constitute the 'practice of law' as defined by the prior opinions of this Committee and the courts of New Jersey." We are fully in accord with that conclusion.

Finally, the Committee declined to apply the traditional public interest test to the question of out-of-state lawyers participating in New Jersey bond issues, noting that the issue in *In re Opinion*

*No. 26, supra,* concerned the right of the public to participate in residential real estate closings without a lawyer, an issue the Committee regarded as substantially distinguishable from the right of New Jersey public entities to engage in the sale of bond issues with representation by out-of-state counsel.

### B

In resolving the issues presented by this appeal we emphasize that our holding and analysis are limited to the issue before us— the propriety of attorneys unlicensed in New Jersey performing legal services in connection with bond issues by New Jersey public entities.

Contrary to the Committee's conclusion, our disposition of this appeal *is* dictated by the public interest standard that this Court historically and consistently has applied in resolving unauthorized-practice-of-law issues. Accordingly, our resolution is determined not by whether the performance of legal services by out-of-state lawyers on New Jersey bond issues constitutes the practice of law, "but rather by asking whether the public interest is disserved by permitting such conduct." *In re Opinion No. 26, supra,* 139 *N.J.* at 340, 654 *A.*2d 1344. We are persuaded that in certain contexts the public interest will not be disserved by permitting out-of-state lawyers to perform such services.

One such context is the retention by New Jersey counsel, on its own initiative or at the request of the issuer, of an out-of-state law firm to provide special assistance and expertise in connection with legal matters related to the bond issue. Although the need for the retention of out-of-state lawyers is sharply contested by counsel to the NJSBA, we are satisfied, based on examples both in the record and referred to at oral argument, that the potential benefit to New Jersey issuers and their counsel of the expertise and experience that out-of-state law firms might offer should not be lost because lawyers in those firms are unlicensed in New Jersey. Counsel for the Committee acknowl-

edged at oral argument that Opinion 33 should not be read to preclude New Jersey law firms retained to represent public entities in bond issue matters from retaining out-of-state firms, if necessary, to provide through the New Jersey law firm specialized legal advice and services to the issuer, and that lawyers from such firms should be allowed to participate directly in conferences and discussions with the issuer in conjunction with New Jersey counsel. The NABL concurred, asserting that bond counsel licensed to practice in New Jersey should be permitted to engage the services of attorneys unlicensed in New Jersey in their own firm or qualified out-of-state firms to provide specialized advice and services through the New Jersey bond counsel to the governmental issuer. Both counsel to the Committee and the NABL acknowledged that the retention by New Jersey bond counsel of attorneys unlicensed in New Jersey or out-of-state firms was conditioned on the recognition that New Jersey licensed bond counsel retained responsibility for representation of the issuer. We hold that out-of-state firms or lawyers unlicensed in New Jersey affiliated with multi-state firms that have bona fide offices in New Jersey may perform legal services related to New Jersey bond issues if engaged to do so by New Jersey bond counsel who retains overall responsibility for representation of the issuer.

As noted, *supra* at 67–68, 733 *A*.2d at 480, the Guidelines, applicable to the State and its agencies and authorities, provide that except in extraordinary circumstances only law firms with bona fide offices in New Jersey will be considered for selection as bond counsel. Before us the Attorney General contends that state issuers, as well as other New Jersey public entity bond issuers, should be permitted in special circumstances to retain directly out-of-state law firms to act as bond counsel where the law firm's special experience, qualifications and expertise justify that retention because of the unique characteristics of the proposed bond issue and the unavailability of equivalent experience, qualifications and expertise among New Jersey law firms. The Attorney General contends that in such special circumstances direct retention of an out-of-state law firm, rather than retention through New

Jersey bond counsel, should be allowed in the public interest because direct retention is more efficient and less costly. The Attorney General asserts that in such unique circumstances the obligatory retention of New Jersey bond counsel as an intermediary to engage out-of-state counsel would be duplicative and would interpose an unnecessary barrier between the issuer and out-of-state bond counsel.

■ We agree with the Attorney General's premise that certain bond issues may be so complex, novel, or may sufficiently implicate untested legal theories and techniques that the retention by a New Jersey public entity of an exceptionally qualified out-of-state law firm may well serve the public interest. Anecdotally, the Court is aware of a proposal currently under consideration by some states and cities to securitize their share of the collective settlement with the tobacco industry by issuing bonds that are secured by the anticipated share of the settlement. *See* Daniel Kruger, *N.Y.C. Coins Tobacco Issuer*, The Bond Buyer, Mar. 9, 1999, at 1 (noting that New York City's securitization plan could set national standard for future asset-backed tobacco bonds). Without attempting to limit unduly the type of bond issue that might justify retention of an out-of-state law firm, that proposal may be illustrative of a novel bond issue financing that could justify an issuer's consideration of the direct retention of out-of-state counsel if, in fact, available New Jersey counsel lacked the experience and qualifications to provide the required services. We anticipate that such retentions will be infrequent, and that when they occur the issuer will be prepared to justify the decision to retain directly out-of-state bond counsel. However, in view of our focus on the public interest, an out-of-state law firm directly retained by a New Jersey public issuer to serve as bond counsel in respect of a bond issue that, because of its complexity, novelty or innovativeness, requires the special skill, experience and expertise of that firm will not be engaged in the unauthorized practice of law in New Jersey.

These two contexts—the engagement by New Jersey bond counsel of unlicensed New Jersey lawyers in the same firm or of an out-of-state law firm to provide legal services to the issuer through the New Jersey bond counsel, and the direct retention by a New Jersey public issuer of an out-of-state law firm in the special circumstances described above—are the most persuasive circumstances revealed by this record in which the public interest is better served by permitting the performance of legal services by lawyers who are not licensed in New Jersey. Apart from those special circumstances, we anticipate that as a result of this decision state, county, and municipal bond issuers ordinarily will retain as bond counsel only law firms with bona fide New Jersey law offices and that the required legal services will be performed primarily by lawyers licensed to practice in this State. Consistent with the Attorney General's guidelines, we also expect that the bond counsel selection process will be merit-based and not influenced by inappropriate considerations.

Our conclusion that in such special circumstances services by lawyers unlicensed in New Jersey should not be prohibited is influenced by several factors. We often have explained that the licensing of attorneys "is not designed to give rise to a professional monopoly, but rather to serve the public right to protection against unlearned and unskilled advice and service in matters relating to the science of the law." *Auerbacher, supra,* 142 *N.J.Eq.* at 486, 59 *A.*2d 863. Under the exceptions recognized in this opinion, the need for that protection is substantially diminished. Out-of-state law firms provided virtually all of the bond counsel services required by New Jersey public entities during the first three-quarters of this century, and we infer that in the limited circumstances in which out-of-state law firms will in the future be directly retained those firms will be exceptionally qualified to provide the required legal services. To the extent that multi-state law firms with New Jersey offices permit lawyers unlicensed in New Jersey to perform legal services on New Jersey bond issues under supervision of New Jersey attorneys, we similarly assume that those lawyers will be fully qualified and super-

vised. In addition, the protection of the public ordinarily afforded by licensure is of diminished significance because public entity issuers generally are sophisticated and well represented by local counsel. Although out-of-state law firms are not subject to this Court's disciplinary authority over attorneys, bond counsel practice historically has not been characterized by frequent disciplinary infractions. On balance, we are convinced that the interests ordinarily protected by licensure may in these instances yield to the supervening public interest furthered by our decision.

The Committee next emphasized that New Jersey bond practice did not involve "multi-state transactions," nor did it implicate "tangled and interwoven elements" from different jurisdictions. The Committee observed that New Jersey bond issues "involve only New Jersey—New Jersey facts, New Jersey governments, New Jersey bonds, New Jersey law. The only non-New Jersey element involved in bond practice is federal tax law." Observing that New Jersey bond lawyers are as skilled in federal tax matters as out-of-state lawyers, the Committee found no need to permit out-of-state lawyers to participate in New Jersey bond issue matters. In reaching that conclusion, the Committee distinguished this Court's decisions in *In re Estate of Waring*, 47 *N.J.* 367, 375–78, 221 *A.*2d 193 (1966) (holding that New York law firm's participation with New Jersey counsel in estate matter did not constitute unauthorized practice of law where multi-state relationships and interest were involved), and *Appell v. Reiner*, 43 *N.J.* 313, 316–17, 204 *A.*2d 146 (1964) (holding New York attorney's services in obtaining extensions of credit and compromises of indebtedness in New Jersey not unauthorized practice of law where greater part of client's indebtedness was to New York firm and clients' obligations were intertwined and constituted inseparable unit).

V

We accordingly modify Opinion 33 to conform to this opinion. In the event that time and experience demonstrate that the

exceptions to the general rules concerning licensure that we have recognized should prove in practice to be too broad or too restrictive, the Court is available to revisit the issue.

*For modification*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.